Patricia A. JOHNSON, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 95–1340.

United States Court of Appeals, District of Columbia Circuit.

Argued April 23, 1996.

Decided June 21, 1996.

Rehearing Denied Aug. 28, 1996.

Arthur W. Hahn, Chicago, IL, argued the cause for petitioner, with whom Ronald S. Betman and William W. Davis were on the briefs.

Lucinda O. McConathy, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent, with whom Richard H. Walker, General Counsel, Jacob H. Stillman, Associate General Counsel, and Paul Gonson, Solicitor, were on the brief.

Stuart J. Kaswell and Daniel L. Goelzer, Washington, DC, were on the brief for amicus curiae.

Before: WALD, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Two years ago, in *3M Company v. Browner*, 17 F.3d 1453 (D.C.Cir.1994), we held that the five-year statute of limitations of 28 U.S.C. § 2462 applies not only to judicial proceedings but also to administrative proceedings. In this case, we decide that a Securities and Exchange Commission ("SEC") proceeding resulting in a censure and a six-month disciplinary suspension of a securities industry supervisor was a proceeding "for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise," within the meaning of § 2462. Accordingly we grant petitioner Patricia A. Johnson's petition for review and vacate the SEC's order imposing sanctions on her.

## I. BACKGROUND

Patricia A. Johnson was the branch manager of PaineWebber, Inc.'s Beverly Hills, California office from November 1984 to April 1991. Among the employees she supervised was David Zetterstrom, an account representative who allegedly stole more than $114,000 from his customers between 1987 and 1988 by writing unauthorized checks against their accounts. Though Johnson was unaware of these thefts, she had received other complaints about Zetterstrom's handling of customer accounts which eventually led her to place him on probation, and then fire him, on June 10, 1988. Three days after he was fired, Zetterstrom committed suicide.

After terminating Zetterstrom's employment, Johnson further investigated his activities and learned for the first time that he had stolen clients' funds. PaineWebber began an internal audit, and notified the SEC, which began its own investigation in June 1988. More than five years later, on October 26, 1993, the SEC brought formal charges against Johnson, alleging that she had "failed

reasonably to supervise [Zetterstrom] . . . within the meaning of Section 15(b)(4)(E) of the Exchange Act." Order Instituting Public Administrative Proceedings, *reprinted in* App. 14.[1] The SEC alleged that Johnson had allowed Zetterstrom to issue checks drawn from his customers' accounts without first obtaining from them the required letters of authorization, and that Johnson—even after preliminary evidence of Zetterstrom's wrongdoing had come to light—had allowed him continued access to customers' funds, thereby facilitating his thievery.

In the administrative proceedings, Johnson conceded that Zetterstrom had stolen money from his customers, but disputed the SEC's allegation that her supervision of him was unreasonable. In addition, Johnson claimed that the SEC's action was barred by the general five-year statute of limitations of 28 U.S.C. § 2462:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued. . . .

The SEC denied Johnson's motion to dismiss under § 2462, holding in February 1994 that "[s]ection 2462 does not apply to Commission administrative proceedings." Order Denying Motion to Dismiss at 7, *reprinted in* App. 72. The SEC's position, however, was severely undercut less than two weeks later when this court decided *3M*, rejecting the view that § 2462 applies only to *judicial* proceedings and holding that § 2462 applies to administrative proceedings as well. 17 F.3d at 1457.

Notwithstanding the *3M* decision, an SEC Administrative Law Judge ("ALJ") held hearings and issued a decision in Johnson's case, finding that she had failed reasonably to supervise Zetterstrom, and imposing a six-

month "supervisory suspension" on her. Johnson petitioned the SEC for review of the ALJ's decision, again seeking dismissal based on the statute of limitations.

Evaluating Johnson's second petition in light of *3M*, the SEC articulated another theory for rejecting her claim, holding this time that § 2462 should not apply because the "proceeding before us does not seek to impose a *civil penalty*, but rather to determine the appropriate *remedial action*. The intent of Johnson's suspension is to protect the public from future harm at her hands." Opinion of the Commission at 11, *reprinted in* App. 83 (emphasis added). Finally, the SEC affirmed the ALJ's finding that Johnson had failed reasonably to supervise Zetterstrom, and issued an order saying:

> On the basis of the Commission's opinion issued this day, it is
>
> ORDERED that Patricia A. Johnson be, and hereby is, censured and suspended from acting in a supervisory capacity with any broker or dealer for six months.

Order Imposing Remedial Sanction, *reprinted in* App. 85. Johnson's petition for judicial review followed.

## II. DISCUSSION

The sole question in this case is whether the SEC proceeding which resulted in the sanctions imposed on Johnson was "an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise" within the meaning of 28 U.S.C. § 2462.[2] Because § 2462 is a statute of general applicability rather than one whose primary administration has been delegated to the SEC, we interpret it *de novo*. *Professional Airways Sys. Specialists v. FLRA*, 809 F.2d 855, 857 n. 6 (D.C.Cir. 1987).

1. The SEC offers no explanation for the delay.

2. Notably, the SEC does not dispute here that its proceedings were "an action, suit, or proceeding for the enforcement" of a sanction, but instead argues only that the sanction was not a "civil fine, penalty or forfeiture." Before *3M* it might have been argued that an action in which a penalty was merely *assessed* could not constitute a "proceeding for . . . *enforcement*." In *3M*,

however, after examining the history of § 2462, we rejected that view, noting that the word "enforcement" was added to the statute as part of a 1948 legislative revision which was not intended to affect the substance of the Act. 17 F.3d at 1458. We held therefore that § 2462 applies equally to a proceeding in which a sanction is assessed as well as to one in which the sanction is enforced. *Id.* at 1459.

## A. The Meaning of "Penalty" Under § 2462

■ The term "penalty" is nowhere defined in § 2462, so we must be guided here by the Supreme Court's common-sense rule that "[c]ourts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)).

In common usage, a penalty is "the suffering in person, rights or property which is annexed by law or judicial decision to the commission of a crime or public offense." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1668 (1976). For at least a century, legal dictionaries have similarly defined penalty. *See* BLACK'S LAW DICTIONARY 1020 (5th ed.1979) ("A punishment imposed by statute as a consequence of the commission of an offense."); BALLENTINE'S LAW DICTIONARY 948 (1930) ("An exaction in the nature of a punishment for the nonperformance of an act, or for the performance of an unlawful act, and involving the idea of punishment, whether enforced by a civil or criminal action or proceeding."); 2 BURRILL'S LAW DICTIONARY (1871) ("A punishment; a punishment imposed by statute as a consequence of the commission of a certain act."); 2 BOUVIER'S LAW DICTIONARY 323 (1866) ("By penalty is understood, also, the punishment inflicted by law for its violation. . . .").

■ In *Huntington v. Attrill*, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892), the Supreme Court addressed the question of whether a judgment in a state court was "penal," and thus could not be enforced in another state under the Constitution's Full Faith and Credit Clause.[3] The Court explained that "[p]enal laws, strictly and properly, are those imposing punishment for an offense committed against the state. . . . The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual. . . ." 146 U.S. at 667–68, 13 S.Ct. at 227–28. Put another way, the question of whether a law is penal depends on whether its purpose "is to punish an offense against the public justice of the State, or to afford a private remedy to a person injured by the wrong." *Id.* at 673–74, 13 S.Ct. at 230.[4]

■ Thus where a legal action is essentially private in nature, seeking only compensation for the damages suffered, it is not an action for a penalty. In *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644 (1915), for example, a company which shipped coal had brought suit against a railroad under a federal commerce statute, seeking a refund of alleged overcharges. The railroad argued that the suit was barred by the predecessor to § 2642, Rev. Stat. § 1047 (1913), which imposed a five-year limit on any "suit or prosecution for any penalty or forfeiture, pecuniary or otherwise." Meeker argued that even though it was bringing suit under a federal commerce act, its action was essentially a private one, seeking redress of its economic injuries rather than the imposition of a *penalty* on the railroad. The Supreme Court agreed, saying:

> The words "penalty or forfeiture" in this section refer to something imposed in a punitive way for an infraction of a public law, and do not include a liability imposed solely for the purpose of redressing a private injury, even though the wrongful act be a public offense, and punishable as such. Here the liability

---

**3.** Though *Huntington* itself did not involve § 2462, its definition of "penalty" was cited with approval by the Supreme Court in *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 397, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906), a case involving the predecessor to § 2462.

**4.** The bare fact that the government is the plaintiff does not automatically convert a proceeding into an action for a "penalty" if the government

is only seeking recovery of the damages it suffered. Thus in *Chattanooga Foundry*, the Supreme Court rejected the proposition that an action for damages under a federal antitrust statute was covered by the statute of limitations where the plaintiff (the city of Atlanta) was merely seeking recovery of its economic damages. 203 U.S. at 397, 27 S.Ct. at 66.

sought to be enforced was not punitive but strictly remedial, as is shown by [the language of the commerce act]. So § 1047 is not applicable.

236 U.S. at 423, 35 S.Ct. at 332.

In many other situations the courts have reaffirmed that a sanction which only remedies the damage caused by the defendant does not trigger the protections of § 2462. *See, e.g., Peerless Casualty Co. v. United States,* 344 F.2d 495, 496 (D.C.Cir.1964) (government could maintain action for forfeiture of bail bond even after five years, because such action was essentially just "a proceeding upon the breach of a condition of a contract"); *United States v. Perry,* 431 F.2d 1020, 1025 (9th Cir.1970) (government's action to recover sums allegedly paid in violation of Anti-Kickback Act was not an action for enforcement of a civil penalty within § 2462 because those sanctions "were designed to make the United States whole by recovering the extra costs that occurred when kickbacks were paid"); *United States v. Doman,* 255 F.2d 865 (3d Cir.1958) (provision of Surplus Property Act requiring payment of $2,000 plus double damages for fraudulent transactions was for "compensatory damages" and thus not covered by § 2462), *aff'd sub nom. Koller v. United States,* 359 U.S. 309, 79 S.Ct. 755, 3 L.Ed.2d 828 (1959).

█ In sum, we conclude that a "penalty," as the term is used in § 2462, is a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's action.

### B. *The Sanctions Here*

We turn next to the specific sanctions imposed here, asking whether the suspension of a supervisor or broker fits within this definition of penalty.[5]

At the outset, we agree with the SEC that the test for whether a sanction is sufficiently punitive to constitute a "penalty" within the meaning of § 2462 is an objective one, not measured from the subjective perspective of the accused (which would render virtually every sanction a penalty). It is obviously not enough that the person subjected to a sanction feels pain or finds the sanction disagreeable; as the Supreme Court has pointed out, "even remedial sanctions carry the sting of punishment." *United States v. Halper,* 490 U.S. 435, 447 n. 7, 109 S.Ct. 1892 n. 7, 1901, 104 L.Ed.2d 487 (1989); *cf. United States v. Stoller,* 78 F.3d 710, 715 (1st Cir.1996) (in determining whether a putatively civil sanction is punishment for purposes of double jeopardy clause, court must assess the sanction objectively). Yet, just as obviously, the degree and extent of the consequences to the subject of the sanction must be considered as a relevant factor in determining whether the sanction is a penalty.

█ Here, the sanctions imposed by the SEC—censure and a six-month suspension—clearly resemble punishment in the ordinary sense of the word.[6] The SEC not only re-

---

5. The SEC also suggests in passing that the phrase "pecuniary or otherwise" in § 2462 might only modify the word "forfeiture" and not the word "penalty." *See* Respondent's Brief at 30 (citing doctrine of the "last antecedent"). While this construction might make some sense given the location of the commas in the current version of § 2462 ("any civil fine, penalty, or forfeiture, pecuniary or otherwise"), it would not be as plausible based on the pre–1948 text ("any penalty or forfeiture, pecuniary or otherwise"), which controls in the event of any disagreement. *See 3M,* 17 F.3d at 1458. Because the 1948 amendment added "civil fine" preceding "penalty or forfeiture," the addition of the extra comma after "penalty" appears to be merely a grammatical adjustment. *See United States v. Bass,* 404 U.S. 336, 340 n. 6, 92 S.Ct. 515, 518 n. 6, 30 L.Ed.2d 488 (1971) ("When grammarians are divided, and surely where they are cheerfully tolerant, we will not attach significance to an omitted comma."). We conclude therefore that § 2462 applies equally to pecuniary and nonpecuniary penalties.

6. The SEC argues that "the history and common understanding of such professional sanctions has always been one associated with regulation and remedial purposes, not with punishment." Second Supp. Brief of SEC, at 4. *Cf. Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (examining historical treatment of civil forfeitures to determine whether they are "punishment" for purposes of the Constitution's Excessive Fines Clause). This statement is not persuasive. To the contrary, there is substantial evidence that Congress and the courts have long considered the suspension or revocation of a professional license as a penalty.

stricted Johnson's ability to earn a living as a supervisor during her six-month suspension, but the suspension was also likely to have longer-lasting repercussions on her ability to pursue her vocation. Suspended brokers must forever after disclose the sanction, and it becomes part of their permanent public file. *See* Form ADV, 17 C.F.R. § 279.1, Part I, Item 11(C)(4) (must disclose whether SEC has "entered an order denying, suspending, or revoking the applicant's . . . registration"). Congress has also required securities associations such as the National Association of Securities Dealers to set up a toll-free number for investors and other members of the public to check whether brokers or other brokerage employees have been subject to disciplinary actions. *See* 15 U.S.C. § 78*o*–3(i). These collateral consequences of the censure and suspension, while not the central determinant in whether a sanction reaches

penalty status, do suggest its punishment-like qualities.

This sanction would less resemble punishment if the SEC had focused on Johnson's current competence or the degree of risk she posed to the public. Despite the SEC's claims to the contrary, however, it is evident that the sanctions here were not based on any general finding of Johnson's unfitness as a supervisor, nor any showing of the risk she posed to the public, but rather were based on Johnson's alleged failure reasonably to supervise Zetterstrom, as required by section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act").[7] The SEC initiated these proceedings with an indictment-like document entitled "Order Instituting Public Administrative Proceedings Pursuant to Sections 15(b) and 19(h) of the Securities Exchange Act of 1934," which alleged, *inter alia,* that:

> C. From approximately August 1987 through June 1988, a registered represen-

---

Indeed, as part of the same Act containing one of the predecessors to § 2462—the 1799 Duties and Customs Act—Congress also provided:

> [N]o inspector or inspectors shall perform any other duties or service, on board any ship or vessel . . . other than what is required by this act, under the penalty of being disabled from acting any longer as an inspector of the customs. . . .

Act of Mar. 2, 1799, ch. 22, § 53, 1 Stat. 627, 667. And in the case of *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), the Supreme Court held that attorneys subject to disbarment are entitled to due process protections such as fair notice of the charge, and commented that "[d]isbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer." *Id.* at 550, 88 S.Ct. at 1226. This court, too, has referred to the suspension or revocation of a professional's license as a penalty, *Collins Sec. Corp. v. SEC,* 562 F.2d 820, 825 (D.C.Cir.1977) ("Disbarment or suspension [of an attorney] is equivalent to the penalty imposed on Collins by the SEC here."), as have numerous other state and federal courts from the 19th century to the present. *See, e.g., National Surety Co. v. Page,* 58 F.2d 145, 148 (4th Cir.1932) (finding that a proceeding "to revoke the license of an insurance agent is not, strictly speaking, either a criminal or a civil action. It is an anomalous proceeding, *penal in its nature,* prosecuted, not for the benefit of an individual, but in the interest of the public.") (emphasis added); *Chicago, M. & St. P. Ry. Co. v. Becker,* 32 F. 849, 851 (C.C.Minn. 1887) (considering a Minnesota Act which "provides that no foreign corporation shall seek the federal courts in any suit, under *penalty of having its license revoked*") (emphasis

added); *Ross v. New York State Dep't of Health,* — A.D.2d ——, 640 N.Y.S.2d 359 (1996) ("The penalty of license revocation has been repeatedly imposed in cases involving criminal convictions for Medicaid fraud."); *In re Campbell,* 19 Wash.2d 300, 142 P.2d 492, 496 (1943) (addressing question of whether certain advertisements run by a dentist tended "to deceive the public, thereby subjecting him to the *penalty of having his license revoked*") (emphasis added); *Davis v. Arizona State Dental Bd.,* 57 Ariz. 255, 112 P.2d 877, 880 (1941) (finding that proceedings to revoke a dentist's license are not criminal and thus do not require a presumption in favor of defendant, and stating that the "statute is explicit as to the only penalty which may be inflicted for a violation of the dental act, to-wit, a revocation of the license to practice dentistry"); *American Surety Co. of New York v. Fishback,* 95 Wash. 124, 163 P. 488, 491 (1917) ("The revocation of a license is a penalty.").

While none of these cases involved the issue of whether revocation or suspension of a license is a penalty *within the meaning of § 2462,* they do suggest that the term "penalty," for the past two centuries, has been commonly used by legislators and courts in describing license suspensions and revocations. Thus the SEC's bare assertion that "history and common understanding" support its contrary position simply does not hold true.

7. Where a licensing agency is only evaluating an individual's current competence, it is not clear that there would be a date at which the "claim first accrued" for purposes of § 2462, as there would be under Section 15(b), where the individual has allegedly failed reasonably to supervise someone who has violated the securities laws.

490

tative in PaineWebber's Beverly Hills branch office willfully violated Section 17(a) of the Securities Act of 1933 ..., Section 10(b) of the Securities Exchange Act of 1934 ... and Rule 10b–5 thereunder in that he misappropriated funds from the accounts of customers without their knowledge or consent.

D. During the period from approximately August 1987 through June 1988, Johnson failed reasonably to supervise the registered representative described in paragraph C above with a view to preventing his violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.

*Id., reprinted in* App. 14.[8] Consistent with this charge, the SEC inquiry appears to have focused almost exclusively on Johnson's failure reasonably to supervise, not her current competence or risk to the public.

Although the ALJ held two days of hearings, with three witnesses and 22 exhibits, the SEC cites not a single piece of evidence in the record explicitly supporting its finding that suspension of Johnson was necessary due to Johnson's current unfitness to be a supervisor. In its final order of more than 11 single-spaced pages, the SEC included only one conclusory paragraph concerning the sanction:

> We believe the sanctions of censure and six months suspension from acting in a supervisory capacity with any broker or dealer imposed by the law judge to be warranted. Johnson displayed a lack of hands-on involvement with her staff and a lack of responsiveness to serious violations by a registered representative under her super-

vision. Her deficiencies permitted further violations to occur. Accordingly, we affirm the law judge's sanctions against Johnson.

Opinion of the SEC at 12, *reprinted in* App. 84. This statement, which justifies the sanction solely in view of Johnson's past misconduct, belies the SEC's assertion in this litigation that the sanctions were imposed not as punishment for past dereliction, but primarily because of Johnson's present danger to the public.[9] To the contrary, we conclude that any inquiry into Johnson's current competence or the danger she posed to the public (and the SEC cites to no such inquiry) was at most *pro forma.* In substance, this proceeding was directed toward one thing only— determining whether Johnson had failed reasonably to supervise Zetterstrom within the meaning of the Exchange Act—and the resultant sanction was inflicted on Johnson for that failure.

### C. *Exception for Statutes Protecting the Public?*

The SEC argues nonetheless that a license suspension should not constitute punishment or a penalty where the government's purpose is to protect the public. *See, e.g., Hawker v. New York,* 170 U.S. 189, 200, 18 S.Ct. 573, 577–78, 42 L.Ed. 1002 (1898) (law barring convicted felons from practicing medicine did not violate *ex post facto* clause); *Ex parte Wall,* 107 U.S. 265, 287, 2 S.Ct. 569, 587–88, 27 L.Ed. 552 (1883) (disbarment of attorney could proceed without grand jury indictment or jury trial); *United States v. Stoller,* 78 F.3d at 724 (debarment of individual from banking industry did not violate double jeopardy clause); *DiCola v. FDA,* 77 F.3d 504,

8. The SEC's allegations of failure reasonably to supervise were based on section 15(b)(4)(E) of the Exchange Act, which provides:

> The Commission, by order, shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer if it finds, on the record after notice and opportunity for hearing, that such censure, placing of limitations, suspension or revocation is in the public interest and that such broker or dealer ... has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933,

the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, this title, the rules or regulations under any such statutes, or the rules of the Municipal Securities Rulemaking Board, or *has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision.*
15 U.S.C. § 78*o*(b)(4)(E) (emphasis added).

9. If the SEC really viewed Johnson as a clear and present danger to the public, it is inexplicable why it waited *more than five years* to begin the proceedings to suspend her.

507 (D.C.Cir.1996) (exclusion of an individual from further activities in the pharmaceutical industry was "solely remedial" and thus did not constitute punishment for double jeopardy or *ex post facto* purposes).

While these cases do hold that a license suspension—if motivated by a *bona fide* goal of protecting the public—may not be punishment in various *constitutional* contexts, they do not control the question of whether license suspension is a *penalty for purposes of § 2462*.[10] In the constitutional cases cited by the SEC, the chief concern has been whether a putatively civil or regulatory sanction is in actuality a back-door form of punishment, such that certain constitutional protections should be triggered. Accordingly, the main focus of these cases has been on whether the law imposing the sanctions has an overall remedial *purpose* of protecting the public (with the sanctions being the reasonable means of achieving that purpose). *See Halper*, 490 U.S. at 448, 109 S.Ct. at 1902 ("it follows that a civil sanction that cannot be fairly said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term"). In interpreting § 2462, however, the court's concern is not whether Congress legislated the sanction as part of a regulatory scheme to protect the public, but rather whether the sanction is itself a form of punishment of the individual for unlawful or proscribed conduct, going beyond compensation of the wronged party.[11]

Thus in *Meeker*, the sanction was "strictly remedial" because it only required the defendant to return overcharges to the plaintiff, and did not impose any punishment.[12] Similarly, where the effect of the SEC's action is to restore the *status quo ante*, such as through a proceeding for restitution or disgorgement of ill-gotten profits, § 2462 will not apply. *See, e.g., SEC v. Lorin*, 869 F.Supp. 1117, 1122–23 (S.D.N.Y.1994) (reading *Meeker* to support proposition that disgorgement is not a "fine, penalty, or forfeiture" within the meaning of § 2462 since such sanction is "strictly remedial"); *see also SEC v. Bilzerian*, 29 F.3d 689, 696 (D.C.Cir. 1994) (SEC disgorgement order "is remedial in nature and does not constitute punishment within the meaning of double jeopardy"); *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989) (holding that remedy of disgorgement may be ordered in an amount "causally related" to the wrongdoing "but disgorgement may not be used punitively").

The sanctions imposed here, however, are certainly not "remedial" in the sense that term is used in *Meeker* and its progeny, for they are not directed toward correcting or undoing the effects of Johnson's allegedly faulty supervision. Unlike restitution or dis-

---

**10.** The SEC's own position on what constitutes a penalty appears to vary with the context. In *SEC v. Telsey*, Fed. Sec. L. Rep. (CCH) ¶ 97,000, 144 B.R. 563 (Bankr.S.D.Fla.1992), the court agreed with the SEC that disgorgement orders are not dischargeable in bankruptcy because they have a deterrent purpose and thus *are* a "fine, penalty, or forfeiture." The SEC never explains why the position it took in *that* case should not apply here as well.

**11.** It is clearly possible for a sanction to be "remedial" in the sense that its purpose is to protect the public, yet not be "remedial" because it imposes a punishment going beyond the harm inflicted by the defendant. *See In re Ruffalo*, 390 U.S. at 550, 88 S.Ct. at 1226 (in due process context, finding that "[d]isbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer"); *Collins Sec. Corp.*, 562 F.2d at 825 ("In one sense, both labels are correct. From the point of view of the public and enforcement agency, the action of the SEC is 'remedial.' To the broker removed from his profession the action partakes of 'punitive' impact.").

**12.** Other cases outside of the § 2462 context have also found SEC disciplinary actions "remedial" because of the "public interest" involved. *See, e.g., Decker v. SEC*, 631 F.2d 1380 (10th Cir.1980) (in assessing standard of proof, commenting that SEC disciplinary actions "are considered remedial in character, with the primary function of protecting the public"); *Blaise D'Antoni & Associates v. SEC*, 289 F.2d 276, 277 (5th Cir.) (SEC's revocation of a corporation's brokerage registration was not an abuse of discretion nor was it unreasonable, because "[r]evocation and denial of registration are but means to protect the public interest"), *cert. denied*, 368 U.S. 899, 82 S.Ct. 178, 7 L.Ed.2d 95 (1961). Because these cases also focus on a sanction's overall public purpose, not its intrinsic nature as punishment for past transgressions, they are similarly inapposite.

gorgement, the sanctions here do not attempt to restore the stolen funds to their rightful owner.[13] To the contrary, the sanctions in this case impose a punishment for Johnson's violation of a standard laid down in the Exchange Act, and qualify therefore as a "penalty" within the meaning of § 2462.

### D. *Public Policy Exception?*

Finally, the SEC suggests that we should narrowly construe "penalty" in this case, in light of the fact that its proceedings "serve[ ] public policy by preserving public rights, revenues and interests," SEC Brief at 33. While we do not doubt the public importance of SEC proceedings, the Supreme Court has admonished us that:

> Whatever prejudice there may have been in ancient times against statutes of limitations, it is a cardinal principle of modern law and of this court, that they are to be treated as statutes of repose, and are not to be construed so as to defeat their obvious intent to secure the prompt enforcement of claims during the lives of the witnesses, and when their recollection may be presumed to be still unimpaired.

*Campbell v. City of Haverhill,* 155 U.S. 610, 617, 15 S.Ct. 217, 220, 39 L.Ed. 280 (1895).[14] The SEC also directs us toward cases which serve up maxims about the need for strict construction of statutes of limitation, *see* SEC Brief at 32. But as we pointed out in *3M,* 17 F.3d at 1457, such cases—including their maxims—are unpersuasive, as they run counter to the Supreme Court's basic position on the subject, first stated by Chief Justice Marshall:

> In a country where not even treason can be prosecuted, after a lapse of three years, it would scarcely be supposed, that an individual would remain for ever liable to a pecuniary forfeiture.

*Adams v. Woods,* 6 U.S. (2 Cranch) 336, 341, 2 L.Ed. 297 (1805).

Finally, any public policy concerns in this case are greatly attenuated because § 2462 applies "[e]xcept as otherwise provided by Act of Congress," and thus Congress, should it believe a five-year statute of limitations is too burdensome in any particular situation, can simply put in a longer limitations period.[15] We therefore find no reason based on public policy or general concerns about statutes of limitation to depart from the "ordinary, contemporary, common meaning" of the word "penalty," as a sanction imposed by the government for unlawful or proscribed conduct which goes beyond remedying the damage caused to the harmed party.

### III. CONCLUSION

We find that the five-year statute of limitations set forth in § 2462 does apply to SEC proceedings under section 15(b) of the Securities and Exchange Act of 1934 which seek to censure and suspend a securities supervisor. Accordingly, we grant Johnson's petition for review, and vacate the SEC's order imposing sanctions on her.

*So ordered.*

---

**13.** PaineWebber voluntarily reimbursed its customers for the thefts from their accounts, and therefore currently bears the economic cost of the injury.

**14.** In addition, the SEC argues that enforcing § 2462 would "hobble efforts to prevent future harm to the public." SEC Brief at 33. It is equally likely, however, that once the SEC has delayed more than five years in proceeding against a broker it considers a grave threat to the public, the bulk of the harm has already been done.

**15.** Congress has in fact provided for longer limitations periods elsewhere in the Exchange Act. *See* 15 U.S.C. § 78*o*(b)(4)(B) (SEC may sanction broker who has been *convicted* by a foreign court of a securities violation within the past ten years).