WILLIAMS, Senior Circuit Judge,
dissenting in part:
I respectfully dissent from Part IV.B of the court’s opinion, which rejects Zacharias’s and Carley’s petition for review of the SEC’s disgorgement order.
We have explained in the past that “disgorgement may not be used punitively” and that it applies only to “property causally related to the alleged wrongdoing.” SEC v. First City Financial Corp., 890 F.2d 1215, 1231 (D.C.Cir.1989). As a result, “the SEC generally must distinguish between legally and illegally obtained profits.” Id. See also Johnson v. SEC, 87 F.3d 484, 491 (D.C.Cir.1996) (explaining that it is not a punishment “where the effect of the SEC’s action is to restore the status quo ante, such as through a proceeding for ... disgorgement of ill-gotten profits”). In First City we specified a sequence to be followed in such matters. We said that “the government’s showing of appellants’ actual profits on the tainted transactions at least presumptively satisfied” the government’s burden to show that “its disgorgement figure reasonably approximates the amount of unjust enrichment.” 890 F.2d at 1232 (emphasis added). At that point, “the burden of going forward shifted to [appellants, who] were then obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation.” Id. Here (contrary to the panel’s assertion, Maj. Op. at 471-72), the SEC did not attempt even a superficial showing of petitioners’ profits; instead it pointed simply to their proceeds from the sales, after an arbitrary deduction of some costs but not others. The case should be remanded to the Commission to take the first step prescribed by First City.
Our cases make clear that proceeds alone cannot normally be regarded an approximation of profits. In First City appellants had violated § 13(d) of the Exchange Act by deliberately failing to disclose their accumulation of over five percent of a company’s stock within 10 days. 890 F.2d at 1217. As a result of their trades they received proceeds of *317 $134.1 million, “resulting in a $15.4 million profit.” Id. at 1220. The district court ordered disgorgement of a subset of this profit, $2.7 million, excluding increases in stock value occurring before appellants’ duty to reveal their purchases arose. The district court saw that subset as causally related to the violation, explaining that appellants’ purchases thereafter were “at an artificially low price due to their failure to make the section 13(d) disclosure.” Id. at 1221. We approved that reasoning. Id. at 1230.
SEC v. Bilzerian, 29 F.3d 689 (D.C.Cir.1994), is similar. Bilzerian had concealed his stock holdings and his financing capabilities in order “to create the impression that he was ready, willing and able to mount hostile takeovers.” Id. at 692. As a result, he was found to have violated § 10(b) and § 13(d) of the Exchange Act. The district court found, and we affirmed, that Bilzerian’s “misrepresentations inflated the price he received from the sale of the securities.” Id. at 696. As a result, the court “ordered Bilzerian to disgorge the difference between the price he received for the sale of his shares — inflated artificially by his false filings with the SEC — and the price the shares would have brought were it not for his untimely and misleading filings.” Id. at 697. Though the defendant challenged the amount of disgorgement ordered by the district court, we affirmed because the “court was careful to order disgorgement of the profits caused by [defendant’s] securities violations only.” Id. (emphasis added). As had the court in First City, the district court had started by subtracting the defendant’s purchase price of the stock from his final sale price (before making a further adjustment to avoid any disgorgement of legitimate appreciation). Id.
Thus, in both Bilzerian and First City we affirmed disgorgement orders only when they were limited to an approximation of the profits received by the defendants attributable to their unlawful conduct. Neither First City nor Bilzerian treats an initial calculation of mere proceeds as adequate to force the defendants to provide an alternative calculation of actual profits. Rather, in both cases the court first deducted the entire cost of acquiring the stock used to perpetuate the fraud from the wrongdoer’s final proceeds, and then further reduced the disgorgement amount so that it reasonably approximated the profits actually caused by the fraud.
Here, in purporting to restore the status quo ante, and even though it claimed to be following the sequential process outlined in our cases, see John A. Carley, Opinion of the Commission and Order Imposing Remedial Sanctions 43-44, Admin. Proc. File No. 3-11626, Securities Act Release No. 8888, 92 SEC Docket 1693, 2008 WL 4291978 (Jan. 31, 2008)(“£®C Opinion”), the SEC took a far different approach. Rather than making any attempt to deduct the entire cost of the stock or in any way calculate how the § 5 violations affected petitioners’ selling price, it focused only on their proceeds. When discussing petitioner Zacharias’s disgorgement order, it stated, “Zaeharias sold [stock] in violation of Section 5 of the Securities Act. Disgorgement prevents Zaeharias from retaining the proceeds of these illegal sales and as such serves a remedial rather than a punitive purpose.” See SEC Opinion 44 (emphasis added). Similarly, when discussing petitioner Carley’s disgorgement order, the SEC stated, “The amounts Carley received through these sales are therefore ill-gotten gains that should be disgorged.” Id. (emphasis added). The SEC made no finding, as we did in both Bilzerian and First City, that petitioners’ conduct somehow influenced their stock’s cost or selling price. Indeed, the only evidence in the record that speaks to the price of the stock *318 indicates that it was the general rise in the price of technology stocks, coupled with Starnet’s drastic increase in net revenue, that led to its price explosion. See John A. Corley, Initial Decision 6, Initial Decision Release No. 292, Admin. Proc. File No. 3-11626 (July 18, 2005). Were the SEC’s reasoning sound, the Commission in First City could have shifted the burden to appellants merely by noting the proceeds of $134 million.
In essence, the SEC’s simulated computation of the status quo ante disregarded the property that petitioners supplied in return for the Starnet stock that was then sold in violation of § 5 — the options that had been legally registered and issued to them pursuant to Starnet’s Forms S-8. See SEC Opinion at 5. The Commission made no attempt to explain why it did not deduct the options’ value. Consider an economically equivalent transaction: suppose that instead of being paid in part with options, petitioners’ salaries had been equivalently higher and they had used the incremental cash income to purchase Star-net stock to funnel through the Peeper Entities to the public. In such a scenario, the SEC’s failure to deduct the cost would have represented a naked violation of the principles of First City and Bilzenan.
To be sure, the fact that the cost of petitioners’ stock took the form of options made it harder to compute a restoration of the status quo ante. Application of those cases’ principle would require a calculation of the value of the options that petitioners could have legitimately and contemporaneously realized. The calculation might well have been difficult, and under our cases petitioners would have borne “the risk of uncertainty.” First City, 890 F.2d at 1232. (I note, however, that in order to show the effect of the employee stock options on the company’s net income, Starnet filed reports stating the fair value of the options calculated under methods approved by the Commission. See, e.g., Exhibit 442, Joint Appendix 1332.) While the majority suggests various factors that might have justified the SEC in assigning the options a zero value, see Maj. Op. at 472 n. 2, the SEC Opinion’s pretend search for the status quo ante makes no mention of petitioners’ costs and simply asserts that their proceeds resulted from their § 5 violation. We can affirm only on the basis of the Commission’s reasoning, see, e.g., SEC v. Chenevry Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943), not on my colleagues’ speculations, however intuitively plausible and perhaps, in the end, correct.
Though the Commission consistently referred to its disgorgement amount as an approximation of mere “proceeds,” it evidently made a deduction for the exercise price of the options and brokers’ fees, as the Commission only ordered disgorgement of the final amounts actually remitted to petitioners Carley and Zacharias in their brokerage accounts, which were net of these costs. If anything, this makes the Commission’s position even more obscure. The fact that it deducted some costs for obtaining the stock provides no answer for why it failed to deduct others. If the majority is right, and the SEC can simply point to proceeds without any explanation as to why certain costs of obtaining such proceeds are irrelevant, then it can simply pull a profit estimate out of thin air (e.g., gross proceeds) and thereby switch the burden to the petitioners to refine that calculation. Our case law, however, clearly requires that the SEC, on its own, make a “reasonable approximation of profits,” First City, 890 F.2d at 1231, and not an entirely arbitrary one.
The majority relieves the SEC of its burden to value the options on its own because “the burden of uncertainty in calculating ill-gotten gains falls on the wrongdoers who create that uncertainty.” Maj. *319 Op. at 472-73. But none of the cases cited by the majority supports the proposition that uncertainty shifts the initial burden. Instead, the cases merely justify imprecision in that attempt so long as the attempt itself was a reasonable one. See First City, 890 F.2d at 1232 (explaining that “the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty” only after the SEC’s showing of a reasonable approximation of actual profits); Bilzerian, 29 F.3d at 697 (same).
I am somewhat puzzled by the panel’s suggestion that we are jurisdictionally barred from considering petitioners’ contentions, or at least some aspect of them. The court concedes petitioners properly raised, both before us and the SEC, the argument that the SEC’s order failed to restore the status quo ante. See Maj. Op. at 471-72. As the Commission’s “proceeds” analysis did not even allude to what petitioners’ gave up in exchange for the proceeds, it plainly made no effort at all to approximate the status quo ante — at least no non-frivolous effort.
Even assuming arguendo that the SEC’s superficial discussion was enough to meet its burden under First City, the panel’s claim that petitioners did not adequately raise the issue of the consideration they provided turns on a quibble. Before the Commission they argued that the disgorgement should be zero, because they gave up their stock, which they asserted was “actually worth the amount for which it was sold” and whose value had been found by the administrative law judge to be based on Starnet’s “dramatic business success.” Brief in Support of Petition for Review of Respondent Christopher H. Zacharias at 18 (Oct. 17, 2005). As my analysis above indicates, I do not regard this analysis as complete, for it doesn’t address the obstacles to petitioners’ contemporaneously and lawfully realizing that value. But the Commission’s only response was to say that the stock was sold illegally, so that (non sequitur of the day!) petitioners must forego all proceeds. The Commission offered no argument as to how compliance with the requirement of filing a registration statement would have reduced petitioners’ proceeds; it stood simply on the raw fact of illegality. Before us, though the majority claims otherwise, Maj. Op. at 473-74 n. 3, petitioners’ attack on the SEC’s failure to restore the status quo ante has drawn our attention also to the value of the options, which were unequivocally theirs. “The options issued to Carley were valid and ... Carley had a valuable property right in the options and then in the underlying stock subject to the options.” Carley Opening Br. 19. And, as the argument suggests, the value of the stock was mathematically tied to the value of the options, the only difference being the contractually prescribed exercise price. Even if we regard as extreme petitioners’ alternative calculation (showing no excess of illegitimate over legitimate proceeds), the SEC never attacked their calculation by pointing to obstacles to petitioners’ lawful realization of identical proceeds. Thus, again assuming that the Commission met its initial First City burden, petitioners’ claim was enough to switch the burden back to the SEC to show why its order properly accounted for all property legally owned prior to the scheme.
In discussing this same jurisdictional argument, the majority seems to suggest that the petitioners’ attack on the SEC’s order as failing to restore the status quo ante was somehow “not aimed at the Commission’s calculation of ill-gotten profits.” Maj. Op. at 473-74 n. 3. But the majority correctly states that the very reason disgorgement is not a penalty is because “disgorgement restores the status quo ante by depriving violators of ill-gotten profits.” Maj. Op. at 471 (emphases added). An *320 attack on the SEC’s order as one that failed to restore the status quo ante, which was indisputably advanced below, see SEC Opinion at 44 (responding to the argument that “disgorgement would not return Mr. Zacharias to the status quo ante” (internal quotations omitted)), is therefore by definition an attack on the SEC’s calculation of ill-gotten profits. Petitioners’ argument, both before the Commission and us, has been that the SEC’s calculation of ill-gotten profits was flawed because petitioners would have received the same profits even if they had acted lawfully. While it is true the petitioners argued they should not return any of their proceeds, that was because they claimed that the SEC’s calculation was inappropriate, not because of any notion that disgorgement can never be properly applied in the context of a § 5 violation, as the majority seems to suggest. Thus, I fail to see anything meaningful in the distinction the majority claims exists between the arguments advanced by petitioners and the arguments discussed here, see Maj. Op. at 473-74 n. 3, apart from the quibble over option value versus stock value.
I would remand to the SEC for it either to explain why the mere presence of options, as opposed to cash, justifies its dispensing with the process outlined in First City and Bilzerian, or to make an initial calculation of the value petitioners could have legitimately and contemporaneously realized from their options.