**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FREQUENCY ELECTRONICS,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.                                                          No. 97-1551

UNITED STATES DEPARTMENT OF THE
AIR FORCE,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-97-230-A)

Argued: October 31, 1997

Decided: July 1, 1998

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge,
and BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion. Senior Judge Butzner
wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Arnold S. Schickler, SCHICKLER & SCHICKLER,
L.L.P., New York, New York, for Appellant. Alisa Beth Klein,
Appellate Staff, Civil Division, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Harvey

S. Israelton, SCHICKLER & SCHICKLER, L.L.P., New York, New York, for Appellant. Frank W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, Anthony J. Steinmeyer, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Lt. Col. Richard E. Prins, Deputy Chief, Commercial Litigation Division, DEPARTMENT OF THE AIR FORCE, Arlington, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Frequency Electronics, Inc. (FEI) was suspended from eligibility for new prime contracts with the United States on December 13, 1993. After the Air Force reviewed the suspension and decided in early 1997 not to lift it, FEI brought this action under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706, seeking review of the 1997 decision and requesting an order terminating the suspension. The district court granted summary judgment for the government, and FEI appeals. We affirm.

I.

FEI makes precision timing systems for use in satellites and weapons systems. In the past, much of its business involved the performance of government contracts. On November 17, 1993, a federal grand jury in the Eastern District of New York indicted FEI and four of its officers. The indictment charged the defendants with conspiracy to defraud the government, making false claims to a government prime contractor, and major fraud against the United States. The indictment alleged that in 1988 and 1989 the defendants falsified and inflated claims for costs, employee hours worked, and materials. Cf. United States v. Frequency Electronics, 862 F. Supp. 834, 836-37

2

(E.D. N.Y. 1994) (denying motions to dismiss indictment). In addition to the criminal charges, the government has filed a civil suit under the False Claims Act and has joined a qui tam suit against FEI. These civil matters are also pending in the Eastern District of New York.

Following the indictment, FEI submitted to the Air Force a written report addressing the allegations. The Air Force considered the report, met with FEI, posed questions about the situation, and received FEI's replies to these questions. By letter dated December 13, 1993, the Air Force Suspension Officer (AFSO) informed FEI that it was suspended from receiving new prime contracts with the government. The letter expressly noted that the suspension "is temporary pending the outcome" of the criminal proceeding and that FEI was free to submit further information demonstrating that the suspension should be lifted. An accompanying memorandum explained that the Air Force was concerned that FEI did not have adequate internal procedures to ensure ethical behavior and that Martin Bloch, FEI's former president and one of those indicted, continued to work for FEI and "retain[ed] responsibility regarding certain classified Government contracts."

Over the next three years, FEI submitted many documents to the AFSO in an attempt to demonstrate that it could be entrusted with new contracts. On January 23, 1997, the AFSO informed FEI that the suspension could not be terminated at that time because there was not "any basis to conclude that . . . there have been changed circumstances since the suspension, or that FEI is presently responsible." The AFSO again expressed concern over Bloch's involvement with the company, stating that "there has been no bona fide change in Martin Bloch's responsibilities within FEI since the imposition of the suspension." Moreover, there was "no record evidence that [an ethics and compliance] program has been implemented or is working" at FEI.

Meanwhile, the criminal proceeding against FEI has been stalled for reasons that are not fully explained in the record. We do know that the district court hearing the criminal case has held hearings under the Classified Information Procedures Act, 18 U.S.C. app. 3 ("CIPA"), because discovery for and trial of the case may involve the disclosure of classified information. We also know that FEI has waived its right to a speedy trial.

3

FEI responded to the AFSO's decision not to lift the suspension by filing this suit. It alleged that the continued suspension violated the Federal Acquisition Regulations and deprived it of due process of law. The district court entered summary judgment for the government, and FEI appeals.

II.

At bottom, FEI wants us to order the government to allow it to bid on government prime contracts. We start, then, with a look at the terms on which the government does business generally.

A private entity can ordinarily deal with whomever it likes, even for arbitrary or whimsical reasons. A democratic government, however, must act more rationally. The Federal Acquisition Regulations[1] implement a comprehensive, evenhanded procurement procedure that both shields the government from the corruptive (and expensive) evils of cronyism and affords equal opportunity for budding entrepreneurs to sell it better products at better prices.

But the principles of openness and evenhandedness do not give companies an unqualified right to compete for government contracts. Not only must the government be a fair and rational shopper, it may also insist on capable, impeccably honest vendors and top quality goods and services.

To this end, the regulations command that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." 48 C.F.R. § 9.103(a)."Responsibility" requires an affirmative showing by the prospective contractor. See id. § 9.103(c).

_____

[1] General, government-wide acquisition regulations are found in Chapter 1 of Title 48 of the Code of Federal Regulations, 48 U.S.C. §§ 1.000 to 53.303. Each subsequent chapter of that title prescribes rules specific to a given department or agency. Chapters 2 and 53 pertain to the Department of Defense and the Department of the Air Force, respectively, and supplement the general regulations of Chapter 1. While the regulations in Chapter 2 do address debarment and suspension procedures, see 48 C.F.R. ch. 2, app. H, these regulations do not affect our analysis in this case.

If the government's contracting officer does not possess "information clearly indicating that the prospective contractor is responsible, [he] shall make a determination of nonresponsibility." Id. § 9.103(b). Section 9.104-1 defines "responsibil[ity]" and, in general, requires that a contractor must have the financial and logistical ability to perform the contract on schedule, the technical expertise to do so, and "a satisfactory record of integrity and business ethics." See id. § 9.104-1(d).

Though a former or current contractor whose work has pleased the government may have no difficulty in demonstrating its responsibility for a prospective contract, it nevertheless must always make that demonstration. "Responsibility" is a present condition and not an indelible status. Times and circumstances change.

Even the smartest, most careful shopper occasionally falls victim to an unscrupulous vendor. He learns from this misfortune to take his business elsewhere, and he is not easily persuaded that the vendor's sharp dealing was aberrational. The Federal Acquisition Regulations adopt this prudent mindset through their suspension and debarment provisions.

A contractor may be suspended from consideration for new contracts upon "adequate evidence" of one of the seven grounds enumerated in § 9.407-2(a).**2** Moreover, "[i]ndictment for one of the enumerated causes . . . constitutes adequate evidence for suspension." Id. § 9.407-2(b). Suspension is temporary pending the outcome of the investigation and any legal proceedings that may ensue, see id. § 9.407-4(a), though the suspending officer may lift the suspension early if the contractor demonstrates its present responsibility. See id. § 9.407-3(d)(3); Robinson v. Cheney, 876 F.2d 152, 160 (D.C. Cir. 1989).

_____

**2** These grounds are (1) fraud or commission of a crime in the course of obtaining or performing a federal contract, (2) violation of antitrust laws relating to bids, (3) various offenses involving dishonesty or moral turpitude (e.g., embezzlement or bribery), (4) violations of the Drug-Free Workplace Act of 1988, (5) mislabeling an article as "Made in America," (6) commission of an unfair trade practice, and (7) commission of any other offense implicating integrity or honesty in a manner that seriously and directly affects the contractor's "present responsibility." See 48 C.F.R. § 9.407-2(a).

5

In contrast to a suspension, debarment is exclusion from government contracting for a fixed period of time. It is imposed only <u>after</u> completion of the investigation or legal proceedings against the contractor. The duration of a debarment must be "reasonable" and "[g]enerally . . . should not exceed 3 years." 48 C.F.R. §§ 9.403, 9.406-4(a); <u>cf. id.</u> § 9.406(b) (allowing extension of disbarment period).

Suspended or debarred contractors are permitted to continue performance of existing contracts unless the relevant agency head directs otherwise. <u>See id.</u> § 9.405-1(a). The regulations are clear that the express purpose of both suspension and debarment is remedial. They can be "imposed only in the public interest for the Government's protection and not for purposes of punishment." <u>Id.</u> § 9.402(b).

An exception to the general rule underscores the public interest nature of these provisions. An agency head can award a suspended or debarred contractor a new prime contract if the government has a "compelling reason" to do so, <u>see id.</u>§ 9.405(a), even absent a showing of present responsibility. The regulations therefore recognize that while a company's suspension or debarment is normally in the public interest, it can also be in the public interest to award contracts to suspended or debarred companies in certain compelling circumstances.

FEI argues that the AFSO's decision not to lift the suspension was erroneous under the regulations. We may disturb the decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

FEI makes three specific attacks on the AFSO's decision. First, it asserts as a matter of law that a suspension cannot exceed three years. The regulations do not support this argument. Only suspensions that are unaccompanied by legal proceedings have a rigid time limit. <u>See</u> 48 C.F.R. § 9.407-4(b) ("In no event may a suspension extend beyond 18 months, unless legal proceedings have been initiated within that period."). Because the regulations define "legal proceedings" to include both criminal and civil cases and all appeals therefrom, <u>see</u> <u>id.</u> § 9.403, the drafters of the regulations surely envisioned suspensions potentially lasting far longer than three years.

6

Next, FEI contends that the suspension's length has rendered it punitive, in violation of 48 C.F.R. § 9.402(b). We disagree. As we discuss in more detail below, the suspension does not deprive FEI of anything to which it is entitled. It is purely a prophylactic measure designed to keep the government from suffering any harm at the hands of a contractor that has been accused of wrongdoing by a credible source, namely, a grand jury. In this respect, a suspension is a temporary measure that is used to protect the public interest until a debarment decision can be made.

> "It is the clear intent of debarment to purge government programs of corrupt influences and to prevent improper dissipation of public funds. Removal of persons whose participation in those programs is detrimental to public purposes is remedial by definition. While those persons may interpret debarment as punitive, and indeed feel as though they have been punished, debarment constitutes the `rough remedial justice' permissible as a prophylactic governmental action."

United States v. Glymph, 96 F.3d 722, 724-25 (4th Cir. 1996) (quoting United States v. Bizzell, 921 F.2d 263, 267 (10th Cir. 1990)); cf. United States v. Hatfield, 108 F.3d 67, 69-70 (4th Cir. 1997). As the Supreme Court recently reaffirmed, "`revocation of a privilege voluntarily granted,' such as a debarment, `is characteristically free of the punitive criminal element.'" Hudson v. United States, 118 S. Ct. 488, 496 (1997) (quoting Helvering v. Mitchell, 303 U.S. 391, 399 & n.2 (1938)).**3** The same is true for the temporary imposition of a suspension pending the ultimate debarment decision.

Moreover, FEI's assertion that passage of time alone has rendered this remedial sanction punitive ignores substantial case law upholding

_____

**3** The Hudson Court acknowledged that debarment can deter future misconduct and that deterrence is a traditional goal of criminal punishment. See 118 S. Ct. at 496. On the other hand, the mere presence of a deterrent effect does not render a particular remedy punitive, because deterrence can also further purely civil aims (e.g., the prevention of fraud against the government or, as in Hudson, the protection of the integrity of a regulated industry). See id.

7

indefinite and even permanent debarments from government programs or regulated activities against assertions that such debarments inflict punishment. See, e.g., Hudson , 118 S. Ct. at 493-96 (neither civil monetary sanctions nor indefinite debarment from banking industry constituted punishment under Double Jeopardy Clause); United States v. Borjesson, 92 F.3d 954 (9th Cir.) (indefinite debarment from participating in HUD-sponsored housing programs not double jeopardy punishment), cert. denied, 117 S. Ct. 622 (1996); United States v. Stoller, 78 F.3d 710 (1st Cir. 1996) (indefinite debarment from banking industry not punitive for double jeopardy purposes); DiCola v. Food & Drug Admin., 77 F.3d 504 (D.C. Cir. 1996) (permanent debarment from providing services to applicants for FDA approval of drugs not punitive under Double Jeopardy Clause); Bae v. Shalala, 44 F.3d 489 (7th Cir. 1995) (same for Ex Post Facto Clause). Like disbarments, the imposition of a temporary, yet indefinite, suspension is remedial rather than punitive in nature.

Finally, FEI directly attacks the AFSO's decision on its own merits. Our review of an agency determination resting on resolution of disputed facts is highly deferential: we may set the determination aside only if it is "arbitrary and capricious." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377-78 (1989). Under this standard,

> the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, [401 U.S. 402, 416 (1971)]. The agency must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974).

The AFSO articulated two rationales for his decision, neither of which is arbitrary and capricious on its face: (i) Bloch, one of the

8

individuals indicted, continues to play a key role in FEI's management and its performance of existing government contracts, and (ii) FEI has not implemented an effective internal ethics program. We conclude that the AFSO's decision is rationally connected to the facts and hence was not arbitrary or capricious.

As for Bloch, FEI does not seriously contest the facts found by the AFSO. Instead, it argues that his knowledge and ability are vast and essential to FEI's work, including its work on existing government contracts and subcontracts. That may well be, but it is of no moment. Knowledge is not honesty, and ability is not virtue. Bloch's indictment provides the government with a sufficient reason to protect itself from dealings with him, and the government may choose to avoid business with him to the extent the public interest permits.**4**

The adequacy of FEI's internal ethics program is a somewhat different story. In December 1996, amidst settlement negotiations aimed at ending the suspension, the AFSO asked the Defense Logistics Agency to audit FEI's ethics program. This audit would involve interviews of FEI employees. FEI agreed to submit to the audit, but it insisted that its lawyer be present at the employee interviews. Fearful that the presence of FEI's counsel might dampen the candor of the employees, rendering the "audit" worthless, the AFSO insisted that FEI's counsel remain silent during the interviews and leave if any employee wished to be interviewed privately. FEI would not agree to these terms, and the audit was canceled.

In light of the pending criminal case, we can understand FEI's

_____

**4** In this regard, FEI asserts that it has been awarded 740 contracts for government work since the suspension began. It does not specify how many of these are subcontracts, to which different-- and more lenient -- rules apply. See 48 C.F.R. § 9.405-2. The record shows only one instance in which FEI received a prime contract, and this award followed certification that the government had a "compelling need" to make the award. Whether one contract or 740, the government's need does not imply FEI's present responsibility. FEI may simply have the government over the barrel as to certain high technologies; indeed, it touts its past involvement in what it calls "black" programs at the highest level of national security.

9

reluctance to give the government a free hand in conducting interviews of its employees. Its decision may well have been a sound piece of legal strategy. Nevertheless, to have the suspension lifted, FEI has the burden of demonstrating its present responsibility. If it will not, even for sound reasons, the legal effect is the same as if it cannot establish its present responsibility.

The decision of the AFSO is in accordance with law and is not arbitrary and capricious.**5**

III.

FEI also asserts that it has been denied due process because it has not been afforded an opportunity to present live witnesses on its behalf or to confront its "accusers." The regulations call for a process "that [is] as informal as is practicable, consistent with the principles of fundamental fairness." 48 C.F.R. § 9.407-3(b)(1). Live witness testimony and cross-examination of agency witnesses are prescribed only where the suspension is not based on an indictment, and not even then if the Department of Justice advises the agency "that substantial interests of the Government in pending or contemplated legal proceedings based on the same facts as the suspension would be prejudiced." See id. § 9.407-3(b)(2). In actions based on an indictment, the suspending official may generally act on the written record, including any submissions from the contractor. See id.§ 9.407-3(d).

The Due Process Clause does not universally mandate trial-like formalities. "The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." Mathews v. Eldridge, 424 U.S. 319, 348 (1976). "Due" simply means adequate to the task at hand, and adequacy is

_____

**5** FEI also asserts that CIPA prevented it from showing the AFSO classified information that allegedly tends to exonerate it of the criminal charges. FEI's criminal trial is the proper forum for this attempted exoneration. The AFSO here properly focused on factual issues relating to FEI's present responsibility. We think that an obvious purpose of the regulation deeming an indictment "adequate evidence" for suspension is to prevent a parallel inquiry that might prejudice the government, the contractor, or both.

10

measured by the importance of the private interest at stake and by the "`risk of error inherent in the truthfinding process as applied to the generality of [similar] cases.'" Califano v. Yamasaki, 442 U.S. 682, 696 (1979) (quoting Mathews, 424 U.S. at 344). Our first inquiry is therefore into the nature of FEI's interest.

A property interest in a particular governmental benefit requires a "legitimate claim of entitlement" to that benefit. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). Because no one is entitled in advance to the award of a government contract, FEI cannot claim a property interest recognized by the Due Process Clause.

On the other hand, FEI's reputation may be sullied by a suspension for misconduct. Though reputation alone is not protected by the Due Process Clause, Paul v. Davis, 424 U.S. 693, 706-12 (1976), an injury to reputation occasioned by the government's "alteration of some right or status recognized by . . . law" may give rise to a protected liberty interest. See Vanelli v. Reynolds School Dist. No. 1, 667 F.2d 773, 77-78 (9th Cir. 1982); see also Ferencz v. Hairston, 119 F.3d 1244, 1249 (6th Cir. 1997). Eligibility for federal contracts is such a status. Accordingly, suspensions premised on misconduct can deprive the contractor of a "liberty" interest protected by the Due Process Clause. See ATL, Inc. v. United States, 736 F.2d 677, 682-83 (Fed. Cir. 1984); Old Dominion Dairy Prods., Inc. v. Secretary of Defense, 631 F.2d 953, 961-64 (D.C. Cir. 1980). Where the suspension for misconduct is based on a criminal indictment, however, this liberty interest is greatly diminished, because it is unlikely that the suspension tarnishes the contractor's reputation any more than would the indictment standing alone. See FDIC v. Mallen , 486 U.S. 230, 243 (1988).

We have previously indicated that the regulations' requirement of "adequate evidence" of fraud or other similar crimes protects the contractor's due process rights. James A. Merritt & Sons v. Marsh, 791 F.2d 328, 330 (4th Cir. 1986) (reversing preliminary injunction and ruling that due process challenge to regulation was not likely to succeed on merits). As we explained:

> A decision to issue an indictment is made by a deliberative public body acting as an arm of the judiciary, operating

11

under constitutional and other legal constraints. The Constitution does not require the government to wait for the outcome of the criminal proceeding before implementing an administrative suspension when a contractor has been accused of fraud after the grand jury's investigation and deliberative process. An indictment triggers a judicial process which protects the rights of the accused while determining guilt or innocence. The formalities attendant to issuing an indictment carry sufficient indicia of reliability to allow the government to act to protect itself against future dealings with someone accused of fraud.

A suspension is to be imposed "only in the public interest for the Government's protection and not for purposes of punishment." 48 C.F.R. 9.402(b). In this case the public interest and the potential harm to the government coincide. The proper expenditure of tax dollars is, of course, a primary responsibility of government. It is not only correct for the government to question the integrity of a contractor who has been indicted for the manner in which he carried out military contracts, but failure to do so would be highly irresponsible.

Id. at 330-31. Indeed, FEI concedes that the initial decision to suspend it was perfectly lawful and comported with due process.

However, FEI asserts that, because suspension is temporary, the continuance of a suspension for over three years constitutes an additional deprivation requiring additional process, that is, a trial-like hearing.

We will accept without deciding that the premise of this argument is correct -- the sheer duration of a temporary deprivation might trigger a right to supplemental due process at some point -- though defining the contours of any such right would be problematic. How long is too long a temporary deprivation? Does the right to some new process accrue in full at a bright line point or incrementally as the deprivation continues?

We can accept this premise because the regulations are already fully sensitive to it. The suspending officer has the power to lift the

12

suspension upon a showing of present responsibility, and the contractor has the ability to submit documentary evidence demonstrating such responsibility. FEI's retort, of course, is that due process here requires more than the opportunity to submit written evidence. We are not persuaded.

As we noted above, deciding whether a process provides what is "due" requires an examination of the nature and importance of the private right and the risk of error inherent in the process as applied to the generality of cases. The private right here-- the incremental injury to reputation occasioned by the continuation of the suspension of an indicted contractor -- is a slight one indeed.

Moreover, there is little risk of this slight interest's erroneous deprivation through the procedure used. FEI has been indicted and remains under indictment. It is not enough that an oral hearing might permit an indicted contractor to establish its present responsibility in a specific case. Due process is offended only if, in the generality of cases, there is a sufficient risk that a contractor who could make this showing at an oral hearing could not do so through written submissions. Because we conclude that such a risk is small in the general suspension case, we hold that the regulations do not violate due process.

The judgment of the district court is affirmed.

AFFIRMED

BUTZNER, Senior Circuit Judge, dissenting:

I would reverse the district court's grant of summary judgment to the Air Force and remand for further proceedings.

In November of 1993 a grand jury indicted Frequency Electronics, Inc. (FEI) and four of its senior executives, including FEI's then Chairman Martin Bloch, for conspiracy to defraud the United States, fraud and making false statements. Four years later this criminal case is still pending. On December 13, 1993, FEI, Martin Bloch, and the three other FEI executives were suspended by the Air Force pending

13

the completion of the criminal proceeding. The suspensions were based solely on the indictment. FEI asserts, and the Air Force does not contest, that the government was not monetarily harmed from FEI's alleged wrongdoing. FEI has maintained throughout its suspension that the government received full value in the contested transactions.

Upon suspension, Bloch resigned as chairman and voluntarily agreed to stop participating in any board decisions or actions. The three other executives all resigned or were reassigned so that they had no duties or responsibilities that related to FEI's government business. Subsequent to the suspension, Bloch was assigned to some government work but only when he was requested by the government or the government's prime contractor. FEI and Bloch also voluntarily submitted proposed administrative agreements that confirmed Bloch's isolation from FEI's government work.

Retired Major General Joseph P. Franklin, the former Commandant of West Point and Special Assistant to the Chairman of the Joint Chiefs of Staff, was hired in an effort to clean up the alleged problems at FEI. FEI also confirmed its ongoing ethics program by placing over 500 pages in the administrative record that related to its ethics training and compliance program.

During this suspension, FEI has continued to work on government projects, chiefly as a subcontractor. Between December 1993 and December 1996, FEI's government related revenue was $49,218,000. Almost half of that revenue came from contracts awarded to FEI after it had been suspended. At no time during the suspension has FEI been accused of any wrongdoing or has the government complained about the quality of FEI's work. Additionally, the government has acknowledged that FEI is essential on many government contracts and that "it would probably require several years and at least tens of millions of dollars to develop alternate suppliers." JA. 78-79, 2017-2019. Despite these facts the Air Force denied FEI's request to lift the suspension.

FEI invoked the court's equitable powers when it asked the court for a preliminary injunction against the Air Force's suspension. A court sitting in equity has greater flexibility than a court of law. See, e.g., International Union, United Auto., Aerospace and Agric. Imple-

14

ment Workers v. Scofield, 382 U.S. 205, 211 (1965) ("While the court must act within the bounds of the statute and without intruding on the administrative process, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.") (quoting Ford Motor Co. v. NLRB, 305 U.S. 364, 373 (1939)). Despite the literal text of the federal acquisition regulations, I believe that a court sitting in equity must not turn a blind eye to the injustice of FEI's nearly five-year old suspension.

When we consider the circumstances of the case including the length of the suspension, it is apparent that FEI's request is not inconsistent with the regulations. A comparison of a suspension with a debarment discloses that the regulations do not contemplate a suspension of this length. The regulations consider a debarment more serious than a suspension. A company can be suspended prior to receiving a hearing of any kind, but before a company can be disbarred it must receive notice and a hearing. 48 C.F.R. §§ 9.406-3(b), 9.407-3(b)(1). Under the regulations the more serious sanction of a disbarment cannot last for more than three years without a showing that the debarment is necessary to protect the government's interest. 48 C.F.R. § 9.406-4.

When these provisions are read together, the Air Force's position, that a suspension can run for nearly five years without a showing that it is in the government's interest, is inequitable."The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944).

Respectfully dissenting, based on these equitable principles, I would reverse the district court's grant of summary judgment and remand for consideration of injunctive relief.

15