# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 5, 2009          Decided June 23, 2009

No. 08-1134

CHRISTOPHER H. ZACHARIAS,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

Consolidated with 08-1136, 08-1141

On Petitions for Review of an Order
of the Securities & Exchange Commission

*Jeffrey J. Scott* argued the cause and filed the briefs for petitioner Thomas A. Kaufmann.

*David A. Zisser* argued the cause and filed the briefs for petitioner Christopher H. Zacharias.

*Thomas D. Birge* argued the cause and filed the briefs for petitioner John A. Carley.

*Randall W. Quinn*, Assistant General Counsel, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were *Andrew N. Vollmer*, Acting General Counsel, *Jacob H. Stillman*, Solicitor, and *Benjamin L. Schiffrin*, Attorney. *Brian G. Cartwright*, Attorney, entered an appearance.

Before: GINSBURG, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Opinion dissenting in part filed by *Senior Circuit Judge* WILLIAMS.

PER CURIAM[1]:  The petitioners are John A. Carley and Christopher H. Zacharias, officers and directors of Starnet Communications International, Inc., and Thomas A. Kaufmann, a registered representative associated with Spencer Edwards Inc., a United States registered broker-dealer.  They challenge the Securities and Exchange Commission's finding that their participation in certain sales of unregistered securities violated §§ 5(a) and (c) of the Securities Act of 1933, as well as the Commission's imposition of substantial monetary disgorgement orders.  See *John A. Carley*, Opinion of the Commission and Order Imposing Remedial Sanctions, Admin. Proc. File No. 3-11626, Securities Act Release No. 8888, 92 SEC Docket 1693 (Jan. 31, 2008)("*SEC Opinion*").  We affirm the SEC's § 5 decision because the scheme at issue clearly involved an "underwriter," which refutes petitioners' theory that they properly relied on the Regulation S and § 4(1 ½) exemptions.  The SEC also found that petitioners

---

[1] Parts I, II, III, and IV.A of the opinion are by Senior Judge Williams; Part IV.B is by Senior Judge Randolph.

Carley and Zacharias had failed to properly report the scheme on Starnet's annual reports and that this omission violated the antifraud and reporting provisions of the securities laws. We will remand this issue to the SEC for it to explain its finding that the omissions involved a material fact.

Two minor housekeeping matters: First, petitioner Zacharias was also found to have violated § 16(a) of the Exchange Act for failing to file a single report relating to a change in his share ownership. *SEC Opinion* at 34. The Commission did not impose any sanction for this violation, *id*. at 43 n.138, and Zacharias does not appeal the finding. Second, the Commission found that petitioners Carley and Zacharias committed a Rule 13a-11 violation, but it now admits the rule does not apply to the filings at issue here. See Respondent Br. at 50 ("The Commission's mistaken finding of a Rule 13a-11 violation . . . should be set aside."). We therefore set aside the finding.

In Part I of the opinion we set forth the scheme in broad outline; Part II discusses the § 5 violations; Part III addresses the fraud and reporting violations; finally, Part IV addresses the SEC's remedies.

I.

The scheme was quite complex. We will address factual details where necessary in discussion of petitioners' legal claims, setting out here simply a bird's eye view. On one hand were seven foreign entities controlled by Alfred Peeper (collectively, "the Peeper Entities"), owners of several million shares in Starnet, which they had purchased and held pursuant to Regulation S, and which they could lawfully resell to the public. In addition, the Peeper Entities held warrants to several additional million shares—warrants that they had yet

to exercise and that, before the hatching of the scheme, they seemed unlikely to exercise because the warrants' purchase prices exceeded the market price. Had the Peeper Entities exercised these warrants without a view to the distribution of the resulting shares to the public, then their resale of these shares would likely have been legal as well.

On the other hand were petitioners Carley and Zacharias, who at the outset of the story held options to buy several hundred thousand Starnet shares. Sales to the public of shares acquired by exercise of their options would have been illegal unless a registration statement under § 5 had been in effect. A simple sale to the Peeper Entities, by contrast, would likely have been lawful had such a sale complied with certain holding periods as outlined in the SEC's rules and not been part of any "chain of transactions . . . involving any public offering." 17 C.F.R. §§ 230.144 (a), (d).

Carley and Zacharias did not, however, have a registration statement filed. Instead, they arranged with the Peeper Entities that the latter would sell several million of their original and warrant shares and would replace them with shares from Carley and Zacharias, acquired by the latter through exercise of their options. (Kaufmann, along with Eugene G. Geiger, another registered representative associated with Spencer Edwards, handled key aspects of the sales.)

Analyzing the events, the SEC in effect collapsed the transactions, and attributed the Peepers' sales to petitioners. Specifically, the SEC found that Starnet had extended the period during which the Peeper Entities could exercise their warrants to enable the Peeper Entities to participate in the scheme. The Peeper Entities then exercised these warrants and "resold those shares, along with [their original shares] . . . in connection with a distribution in order to fund the option

exercises of the Starnet Option Holders." *SEC Opinion* at 14. Because the Peeper Entities had exercised their warrants with the intention of distributing them to the public, the SEC concluded they were underwriters and were not exempt from the registration requirements of the securities laws. Furthermore, rather than view the option holders' sales as somehow separate from the Peeper Entities' illegal sales to the public, the SEC found that the option holders' "sales to the Peeper Entities were a necessary and critical step in the overall distribution." *Id*. at 15. Thus, because petitioners Carley and Zacharias had sold their option shares to the Peeper Entities and petitioner Kaufmann had executed these sales, the SEC concluded that they should be held liable as participants under §§ 5(a) and (c) of the Securities Act. As we shall see, that decision was a triumph of substance over form. Petitioners pose various legal challenges discussed below; to the extent that they raise "substantial evidence" objections not subsumed in the specific legal issues discussed, we reject such objections as frivolous.

In addition, because Starnet did not disclose the existence of the scheme in its annual report filed with the SEC, the Commission found that Carley and Zacharias violated § 17(a) of the Securities Act and § 10(b) of the Exchange Act (and Rule 10b-5 promulgated thereunder) (collectively, the "fraud violations"), as well as the reporting requirements of § 13(a) of the Exchange Act and various rules thereunder. Both the fraud and reporting violations turn on the SEC's supposition that the scheme was a material fact for purposes of that report.

All three petitioners now challenge the SEC's conclusions regarding § 5 and the resulting monetary penalties. In addition, petitioners Carley and Zacharias challenge the SEC's finding that they violated the antifraud and reporting requirements of the securities laws and its cease-and-desist order.

6

II.

We review the SEC's findings of fact and legal conclusions under the familiar principles of administrative law. The findings of fact are subject to a review for substantial evidence, see *Wonsover v. SEC*, 205 F.3d 408, 412 (D.C. Cir. 2000), and the "other conclusions may be set aside only if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Graham v. SEC*, 222 F.3d 994, 999-1000 (D.C. Cir. 2000) (internal quotation marks omitted).

Sections 5(a) and (c) of the Securities Act prohibit the "sale" and "offer for sale" of any securities unless a registration statement is in effect or there is an applicable exemption from registration. 15 U.S.C. §§ 77e(a),(c). There is no dispute that the securities sold to the Peeper Entities and those sold by the Peeper Entities to the public were not registered under the Securities Act. *SEC Opinion* at 11. *Petitioners*, however, did not actually distribute any shares directly to the public. But we have previously held that for the purposes of § 5 the petitioners do "not have to be involved in the final step of the distribution to have participated in it." *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004). Here the SEC, citing similar cases from other circuits, said that a person who was a "necessary participant" or "substantial factor" in the violation could be found liable. *SEC Opinion* at 17. Once participation in an unregistered sale has been shown, the petitioners have the burden of proving an exemption to the registration requirements. See *SEC v. Ralston Purina*, 346 U.S. 119, 126 (1953) ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable"); *Geiger*, 363 F.3d at 484 (same).

Petitioners Zacharias and Carley claim exemption "under Section 4(1) of the Securities Act . . . through operation of the so-called '4(1 ½)' exemption." Zacharias Opening Br. 36. As the Commission explained, "The Section 4(1 ½) exemption is a 'hybrid exemption' not specifically provided for in the Securities Act that basically allows affiliates to make private sales of securities held by them so long as some of the established criteria for sales under both Section 4(1) and Section 4(2) of the Act are satisfied." *SEC Opinion* at 14 (internal quotation marks omitted). The SEC contends, and Zacharias and Carley accept, that the § 4 (1 ½) exemption will not apply if an underwriter is in the picture. This is because, although "the term '4 (1 ½) exemption' adequately expresses [the relationship between § 4(1) and § 4(2)]," the actual basis "for private resales of restricted securities is § 4(1)." *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 n.6 (8th Cir. 1989). Section 4(1), in turn, exempts "transactions by any person other than an issuer, *underwriter*, or dealer." 15 U.S.C. § 77d(1) (emphasis added). Thus, if an underwriter is present, the § 4(1) exemption, and by extension the 4(1 ½) exemption, cannot apply. See *SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005) ("[I]f any person involved in a transaction is a statutory underwriter, then none of the persons involved may claim exemption under Section 4(1)."). So the § 4 (1 ½) question boils down to Zacharias and Carley's claim that the Peeper Entities were not underwriters.

Petitioner Kaufmann also asserts an exemption that turns on whether or not an underwriter was present. He claims that the Peeper Entities' sales to the public were exempt under Regulation S. That regulation provides two safe harbors from the registration requirements, one allowing for issuers to sell unregistered securities in certain offshore transactions, and the other for resales of such securities, as long as certain requirements are met. See 17 C.F.R. §§ 230.901-904. The SEC, in an attempt to combat abuses under Regulation S

8

whereby issuers funnel securities through foreign entities back to U.S. markets, has made clear that Regulation S will not apply to "[p]ublic resales in the United States by persons that would be deemed underwriters under Section 2(11) of the Securities Act." *Problematic Practices Under Regulation S*, Securities Rel 33-7190 (June 27, 1995), 1995 WL 385849 n.17 (June 27, 1995). Thus, like § 4(1 ½), Regulation S turns on whether an underwriter is involved in the transaction.

Unfortunately for petitioners, the SEC's conclusion that the Peeper Entities were statutory underwriters is amply supported. Section 2(a)(11) of the Securities Act defines "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security, or participates . . . in any such undertaking." 15 U.S.C. § 77b(a)(11). In the present case, the Peeper Entities exercised warrants for Starnet shares and soon sold them to the public, along with their remaining original stock. The only reason the Peeper Entities were able to exercise these warrants was the existence of the scheme, for the warrants would have expired, completely worthless, had not Starnet extended the time of their expiration. Though Zacharias and Carley claim the SEC lacked substantial evidence to support its finding that the warrant period was extended in order to effectuate the scheme, the SEC reasoned that Starnet extended the warrants' term because the Peeper Entities' original shares were not enough to offset the anticipated number of shares to be sold by Starnet's option holders (including officers other than Zacharias and Carley). See *SEC Opinion* at 7-8. Petitioners, in fact, can point us to no other reason why Starnet might have offered the Peeper Entities what proved to be such a valuable extension. Furthermore, the Peeper Entities' initial sales to the public were occasioned by the assurance that the shares would be replaced by those held by the Starnet officers.

Thus, the Peeper Entities clearly "purchased Starnet common stock on the exercise of the warrants . . . with a view to the distribution of such shares," making them underwriters. *SEC Opinion* at 14. Only by viewing the Peeper Entities' sales to the public as somehow entirely separate from the officers' sales to them, as petitioners urge us to do, could the Starnet officers' sales possibly be considered "private." But the record provides ample evidence that all of the sales were connected. See, e.g., Exhibit 67, Joint Appendix ("J.A.") 956 (a memorandum from Peeper's attorney, Dennis Brovarone, explaining the details of the scheme). Thus we easily find substantial evidence and adequate reasoning to support the SEC's conclusion that the Peeper Entities were underwriters.

Zacharias claims a want of substantial evidence for the SEC's finding that he "knew, or should have known" of the Peeper Entities' sales to the public; this, he says, brings the § 4(1 ½) exemption back into the picture. To support the argument, he says that he did not know of the Peeper Entities' later sale of the stock when he sold the shares, and believed that his sale to the Peeper Entities was a legitimate private transaction.

The SEC offers two arguments in response. First, it claims that § 5 imposes strict liability on participants. In its opinion below, however, it left the issue obscure. It stated at the outset that "[a] showing of scienter is not required to establish a violation of § 5." *SEC Opinion* at 11 (citing *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980), and *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1046-47 (2d Cir. 1976)). But then it went on to find that "Carley and Zacharias *knew, or should have known*, of the Peeper Entities role as the conduit of shares of Starnet Common stock to the public." *SEC Opinion* at 15 (emphases added). If the SEC were applying a strict liability standard, such a finding would have been unnecessary.

Ultimately, we need not resolve the question of whether strict liability applies because we affirm the SEC's finding that petitioner Zacharias knew or should have known of the Peeper Entities' distribution to the public. Even if we accept Zacharias's argument that he was not aware that the Peeper Entities would immediately resell his shares to the public, the SEC found that he and Carley "sold their Plan Shares to the Peeper entities to replace the Starnet shares that the Peeper Entities had owned and previously sold to the public on behalf of Starnet Option Holders." *SEC Opinion* at 15. It was this involvement that served as the "necessary and critical step" in the scheme. *Id.* Zacharias's only attack on the finding is a claim that it is "illogic[al]" for the SEC to say that his subsequent sale to the Peeper Entities was a necessary step in a *prior* sale by those entities. But the supposed "illogic" of this claim is undermined by the very presence of the scheme. The Brovarone memorandum, see Exhibit 67, J.A. 956, specifically lays out the process whereby the option holders' *subsequent* sales to the Peeper Entities compensated the Peeper Entities for the *initial* sales to the public. While Zacharias notes that his sales were completed before the Brovarone memorandum was written, the SEC's argument is not that the memorandum *informed* Zacharias but that it summarized a pre-existing plan and that Zacharias's knowledge of the plan's existence could be readily inferred. The finding that Zacharias knew or should have known of the sales to the public is therefore supported by substantial evidence.

Thus, since we reject the application of the § 4(1 ½) exemption and because petitioners Carley and Zacharias do not contest the SEC's finding that they were "substantial factors" in the scheme, we may affirm the SEC's conclusion that Zacharias and Carley were liable as participants in the § 5 violations.

Apart from his Regulation S exemption claim, Kaufmann urges that the sales he executed from the Starnet officers to the Peeper Entities were exempt as private resales under Rule 144. That Rule provides criteria for "determining whether a person is not engaged in a distribution," thus creating a "safe harbor from the Section 2(a)(11) definition of 'underwriter.'" Preliminary Note to Rule 144, 17 C.F.R. § 230.144. It explicitly limits the safe harbor to certain sales of "restricted securities," *id*. § 230.144(b)(1)(i), and in turn it limits restricted securities to securities acquired from an issuer "in a transaction or chain of transactions *not* involving any public offering," 17 C.F.R. § 230.144(a)(3)(i) (emphasis added). There is no dispute in this case that the Peeper Entities offered and sold their original Regulation S and warrant shares to the public, and, as we said before, the SEC reasonably found that the option holders' "sales to the Peeper Entities were a necessary and critical step in the overall distribution." *SEC Opinion* at 15. Rule 144 does not apply.

Petitioner Kaufmann advances several additional arguments, independent of his exemption theories, as to why he did not violate § 5. First, he argues that he was not a statutory seller of securities for the purposes of § 5 because he did not solicit the public to buy any of the shares from the Peeper Entities accounts. Here he relies on *Pinter v. Dahl*, 486 U.S. 622 (1988), where the Court, interpreting the language of § 12(1) of the Securities Act, making a § 5 violator liable in rescission "to the person purchasing [a] security from him," 15 U.S.C. § 77l(a), held that being "merely a 'substantial factor' in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under §12(1)." *Pinter*, 486 U.S. at 654. Because of the "purchas[e] . . . from" requirement, §12(1) liability "extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id*. at

647. As § 5 does *not* include the "purchas[e] . . . from" language or any equivalent, *Pinter* is plainly of no use to Kaufmann. *SEC v. Phan*, 500 F.3d 895, 906 n.13 (9th Cir. 2007). See also *Geiger*, 363 F.3d at 488 (expressing doubt that "*Pinter* is on point" as applied to § 5 violations).

Kaufmann next argues that he was not a "substantial factor" in the sale of the securities to the public because his only role in the scheme was to sell the shares in the Starnet officers' accounts at Spencer Edwards. The SEC found him a "substantial factor" because he accepted the orders to sell the Starnet officers' stock, completed the Forms 144 in connection with these sales, and ensured that the Peeper Entities and their attorney, Dennis Brovarone, had appropriate funds wired to them. As the Peeper Entities would not have sold the shares to the public absent the sale of the Starnet officers' stock to the Peeper Entities, and the Peeper Entities could not have engaged in their additional sales to the public without these transfers, the SEC's finding is adequately supported.

Kaufmann also claims that he properly relied on attorneys' opinions that the sales from the Starnet officers to the Peeper Entities were proper and hence he did not willfully violate §§ 5(a) and (c). It appears to be an open question in this circuit whether reliance on the advice of counsel is a good defense to a securities violation, see *SEC v. Savoy Industries, Inc.*, 665 F.2d 1310, 1315 n.28 (D.C. Cir. 1981), and the parties have not pointed us to any cases resolving the issue. Nor need we resolve it now, because even if counsel's advice is a valid defense Kaufmann could not show that he had met the prerequisites, i.e., that he "(1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." *Id.* Kaufmann points to several letters from various lawyers involved in the

scheme opining on the legality of *portions* of the transactions at issue in this case, but not one of them addresses the legality of the swap transaction that enabled the option holders to exercise their options through the Peeper Entities' sales to the public. There is only one letter in the record that discusses the entirety of the transactions at issue here, one from attorney Brovarone, and at no point in that letter does Brovarone express any opinion on the legality of the scheme as a whole. See Exhibit 67, J.A. 956-57; *SEC Opinion* at 20.

Finally, Kaufmann advances a procedural argument, claiming that the SEC's denial of his motion to sever his proceedings from those of the other parties before the Commission denied him due process and a fair trial. Although "an agency does not have unlimited discretion to consolidate cases," Kaufmann must show "prejudice from the Commission's decision to consider his case along with those of others involved in the alleged fraud." *Nassar and Co. v. SEC*, 566 F.2d 790, 792 n.4 (D.C. Cir. 1977). As evidence of prejudice, Kaufmann says that in denying his motion to sever, the SEC pointed to the fact that "Kaufmann has been charged with aiding and abetting the violations of the other Respondents," *John A. Carley*, Order Denying Motion of Thomas. A. Kaufmann to Sever Proceedings 2, Admin. Proc. File No. 3-11626, Securities Exchange Act Rel. No. 50695 (Nov. 18, 2004), while in fact the aiding and abetting charge was later rejected by the Administrative Law Judge. But the SEC referred to the aiding and abetting charge simply in determining that the case "involved common questions of law and fact," *id*.; as "all the Respondents were involved in an integrated scheme to distribute unregistered securities," *id.*, it did involve such questions.

Kaufmann also claims prejudice on the ground that the evidence against him was "impossibly compromised by the complex, sketchy and inconsistent evidence" against the other

respondents. But in making that claim Kaufmann relies on a proposition that torpedoes it, namely the ALJ's acknowledgement that "[n]o single witness could fully explain the mechanics of the scheme." *John. A. Carley*, Initial Decision 16, Initial Decision Release No. 292, Admin. Proc. File No. 3-11626 (July 18, 2005) ("*Initial Decision*"). The charges against Kaufmann were based on that scheme just as much as were those against the other respondents.

## III.

Petitioners Carley and Zacharias advance numerous arguments in response to the SEC's findings of fraud and reporting violations, only one of which we need to address here. The SEC found that Zacharias and Carley "violated the antifraud provisions of the federal securities laws when they omitted to disclose as a related-party transaction in Starnet's 1999 annual report the nature and extent of the plan to provide Starnet officers and employees with a way in which to exercise their [stock] options." *SEC Opinion* at 33. In order to prove a violation of the fraud prohibition, it is necessary to show, among other things, that petitioners' omission was of a *material* fact. See § 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1); Section § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5. Similarly, the basis for the SEC's finding that Carley and Zacharias violated the Commission's reporting requirements was that they "omitt[ed] *material* information from the applicable Starnet reports." *SEC Opinion* at 33 (emphasis added).

"[T]o fulfill the materiality requirement, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

(1988) (internal quotation marks omitted). The SEC's finding of materiality was, in its entirety, as follows:

> The omitted disclosures were material because they had the effect of hiding the distribution through the Peeper Entities sales of unregistered Starnet securities to facilitate the exercise of options by Starnet officers in violation of Securities Act Section 5. Thus, the undisclosed sales could expose the company to claims of rescission under Securities Act Section 12.

*SEC Opinion* at 32-33.

Contrary to the SEC's blanket assertion, it is far from clear that the scheme would have exposed Starnet to plausible claims of rescission (or damages in lieu of rescission). As we have seen, § 12(a)(1) of the Securities Act, 15 U.S.C. 77l(a)(1), does provide for a rescission remedy against violators of § 5. But it provides that remedy only for "the person purchasing such security from" the violator. 15 U.S.C. 77l(a). As a result, "remote purchasers are precluded from bringing actions against remote sellers." *Pinter*, 486 U.S. at 644 n.21.

Here the only direct purchasers from Starnet were the officers and employees who exercised their options and the Peeper Entities, which purchased stock via exercise of their warrants. While the Starnet officers and directors would have standing to bring a claim for damages in lieu of rescission, the nature of the scheme renders the probability that Starnet would have to pay any damages virtually nil. Section 12(a) allows recovery of "the consideration paid for such security with interest thereon, less the amount of any income received thereon." 15 U.S.C. § 77l(a). As the scheme enabled the Starnet officers to resell and realize a substantial profit on the shares substantially simultaneously with their purchases, the

proper recovery would appear to be zero (even disregarding the company's potential defense that the officers' hands were unclean).

As to the Peeper Entities, the unclean hands defense appears an insuperable obstacle. The SEC found that Mr. Peeper helped develop the scheme at issue in this case, *SEC Opinion* at 6, that he "controlled" the relevant Peeper Entities, *id.*, and that these entities acted as "a conduit . . . for the distribution to the public [of Starnet shares]," *id.* at 14. Apparently bearing "at least substantially equal responsibility for the violations he seeks to redress," *Batemen Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985), Peeper would appear barred unless preclusion of the suit would "significantly interfere with the effective enforcement of the securities laws and protection of the investing public," *id.* Nothing suggests that such preclusion is likely.

On appeal, the SEC offers no further explanation for why Starnet would be exposed to claims of rescission. Instead it argues that the "concealed dilution resulting from the public distribution of Starnet shares" made the omission material. See Respondent Br. at 40. As we do not accept appellate counsel's post hoc rationalizations, *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962), this theory is not properly before us.

We therefore grant the petition for review of the Commission's decision on the fraud and reporting allegations. We leave it to the Commission on remand to address any of the petitioners' remaining arguments on those violations. Furthermore, since the Commission based its cease-and-desist orders against Carley and Zacharias in part on "[t]heir failures to disclose material facts in violation of the antifraud provisions," *SEC Opinion* at 41, we also leave those issues to

the Commission for such reconsideration as it may find necessary.

## IV.

As we uphold the SEC's § 5 findings, and its monetary sanctions against all three petitioners were based solely on the § 5 violations, *SEC Opinion* 44, we must turn to their challenges to those remedies. We first consider Kaufmann's arguments, then Zacharias's and Carley's.

## A.

The Commission barred Kaufmann from association with any broker-dealer (with the right to reapply after five years), but he does not attack that order (except insofar as he challenges the Commission's merits conclusion). He does attack the Commission's disgorgement order against him, requiring him to disgorge half the *total* commissions received by Spencer Edwards for all the sales at issue here, arguing that it was excessive and not based on substantial evidence. He admits that the Commission had substantial evidence of the "total commissions generated by [the combined Peeper Entities sales and Starnet option holder] sales at the brokerage firm," Kaufmann Reply Br. at 11-12, but claims the Commission erred in finding a 50/50 split of the commissions as between him and Geiger.

On the 50/50 split issue, the Commission based its order on the ALJ's finding of such a split. *SEC Opinion* at 45. The ALJ in turn based his finding on two key pieces of evidence. First, he cited a Commission decision in a prior case finding that during 1996 "Geiger generally received a 50% split of the joint commissions." *Initial Decision* at 73 (citations omitted). Second, the evidence proffered by Kaufmann, "an unsigned

handwritten contract" that purported to show that his monthly split ranged from 45% to 24%, *id*., also said that *expenses* would be split in the same proportion; yet, as the ALJ pointed out, Kaufmann claimed he paid 50% of the base salary of the assistant he shared with Geiger. *Id.* The Commission's 50/50 split decision was thus a "reasonable approximation [for division] of profits causally connected to the violation," shifting the burden to Kaufmann to show otherwise. *SEC v. First City Financial Corp., Ltd*, 890 F.2d 1215, 1231-32 (D.C. Cir. 1989).

In support of his critique Kaufmann points to an exhibit which illustrates that "Kaufmann handled the officers' 144 trades . . . and Geiger handled the Peeper entities trades." Kaufmann Opening Br. at 32 (citing Exhibit TK-1, J.A. 522). But that division of labor is not necessarily controlling on how the commissions were split. Further, while Kaufmann asserts alternative ways of splitting commissions, the assertions appear mutually contradictory. He at one point claimed that they were based on "who generated the business," but at another read the handwritten document as calling for splitting commissions "on a sliding scale that varied from month to month." *SEC Opinion*, J.A. 261. Understandably, the SEC affirmed the ALJ's finding that Kaufmann's alternate explanations "lacked credibility," *id.* at 46, and this court is "least inclined to second guess such [credibility] findings where, as here, the Commission affirmed the ALJ who, of course, heard the testimony in question." *Whitney v. SEC*, 604 F.2d 676, 683 (D.C. Cir. 1979). We affirm the SEC's disgorgement order.

Kaufmann also challenges the SEC's imposition of a civil penalty of $110,000. He argues first that he only received $32,527 in commissions, an argument we have already rejected. Next he argues that his case is similar to other SEC decisions where a civil penalty was not imposed. But as we

have said in the past, "The Commission is not obligated to make its sanctions uniform, so we will not compare this sanction to those imposed in previous cases." *Geiger*, 363 F.3d at 488. Finally, he argues that the civil penalty was inappropriate because it will not "remedy 'the damage caused to the harmed parties by the defendant's action.'" Kaufmann Brief 33 (quoting *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996)). But *Johnson* was directed at defining the word "penalty" for the purposes of applying 28 U.S.C. § 2462, which bars recovery of a "penalty" unless the action was "commenced within five years from the date when the claim first accrued." See *Johnson*, 87 F.3d at 486-87 (internal quotation marks omitted). Here the SEC said that it did "not consider misconduct occurring before September 1, 1999, in determining to impose bars or civil penalties, but rather [has] based these sanctions exclusively on [Kaufmann's] conduct during the five-year period preceding the issuance of the [charges against him]." *SEC Opinion* at 36. This would seem to take *Johnson*'s standard out of the picture;yet Kaufmann nowhere contradicts the SEC claim, nor offers any other reason why the Commission must be limited to sanctions designed to remedy "the damage caused to the harmed parties by the defendant's action."

## B.

Finally, we turn to the disgorgement orders imposed against Zacharias and Carley. Under 28 U.S.C. § 2462, agencies may not impose civil penalties in an enforcement action initiated more than five years after the offender committed the illegal act. *3M Co. v. Browner*, 17 F.3d 1453, 1456-58 (D.C. Cir. 1994). The Commission initiated this action on September 1, 2004, more than five years after Zacharias and Carley's illegal sales. Section 2462 therefore prohibited the Commission from imposing civil penalties on

either of them. The question is whether, as Zacharias and Carley argue, the Commission's order requiring them to disgorge all profits (plus prejudgment interest) from their illegal transactions imposes a civil penalty on them.

Zacharias and Carley think *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996), supports their position. Johnson, a brokerage firm manager, supervised brokers who stole roughly $140,000 from customers. The Commission imposed an order of censure and a six-month suspension on him in a proceeding commenced more than five years after the theft. *Id.* at 485-86. We held that the order was punitive, reasoning that it was not causally related to the wrongdoing and went well beyond restoring the stolen $140,000 to the customers. *Id.* at 491-92. Quoting *Johnson*, Zacharias and Carley say the disgorgement order against them was also punitive because it did not "remedy[] the damage caused to the harmed parties by the defendant's action," and did not wholly "restore the *status quo ante.*" *Id.* at 488, 491.

Harm to third parties may be a useful measure of a violator's wrongdoing. But "[w]hether or not [Zacharias and Carley's] securities violations injured others is irrelevant to the question whether disgorgement is appropriate. The primary purpose of disgorgement is not to refund others for losses suffered but rather to 'deprive the wrongdoer of his ill-gotten gain.'" *SEC v. Bilzerian*, 29 F.3d 689, 696 (D.C. Cir. 1994) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)); *see SEC Opinion* at 44-45.

Petitioners' other quotation from *Johnson* is part of this statement: "where the effect of the SEC's action is to restore the *status quo ante*, such as through a proceeding for restitution or disgorgement of ill-gotten profits, § 2462 will not apply." *Johnson*, 87 F.3d at 491. The full statement reflects the point – which petitioners ignore – that

disgorgement restores the *status quo ante* by depriving violators of ill-gotten profits. They also misread the statement to mean that all remedial sanctions must restore violators to the exact financial situation they were in before their wrongful acts. As we recognized in *Johnson* and as the Commission pointed out in this case, *SEC Opinion* at 44, the fact that defendants may suffer some loss is not sufficient to render a sanction punitive. *Johnson*, 87 F.3d at 488 (citing *United States v. Halper*, 490 U.S. 435, 447 n.7 (1989)).

Our disgorgement cases uniformly hold that an "order to disgorge is not a punitive measure; it is intended primarily to prevent unjust enrichment." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000); *see Bilzerian*, 29 F.3d at 696; *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989); *see also Blatt*, 583 F.2d at 1335. Disgorgement deprives wrongdoers of the profits obtained from their violations. *Bilzerian*, 29 F.3d at 696; *Blatt*, 583 F.2d at 1335; *SEC v. Lorin*, 869 F.Supp. 1117, 1123 (S.D.N.Y. 1994). In theory, a disgorgement order might amount to a penalty if it was not "causally related to the wrongdoing" at issue. *First City*, 890 F.2d at 1231; *cf. Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 6 (D.C. Cir. 2000). Petitioners do not dispute that the order against them was causally related to their wrongdoing – the amount they had to disgorge was measured by the profits from their illegal transactions. Nor do they argue that the Commission had the burden to determine the hypothetical market value of the options they had been holding and then to offset their disgorgement by that amount. They merely assert, without factual support, that prior to the transaction they "owned shares of Starnet actually worth the amount for which it [sic] was sold." Brief in Support of Petition for Review of Respondent Christopher H. Zacharias at 18 (Oct. 17, 2005). They make this statement in the context of their *status quo ante* argument, which the Commission properly rejected. *SEC Opinion* at 44-45.

Our dissenting colleague would vacate the disgorgement order because the Commission did not deduct the value of the options from the disgorgement amount. Dissent at 4. But petitioners never asked the Commission to value the options or to perform the calculation the dissent contemplates, and petitioners' briefs in this court never mentioned the issue discussed in the dissent.[2] We have no jurisdiction to consider an objection a petitioner did not make in the agency proceeding. 15 U.S.C. § 77i; *see EEOC v. FLRA*, 476 U.S. 19, 22-24 (1986) (indicating that exhaustion requirements are jurisdictional and cannot be waived by the agency); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982) (same).[3] More than that, disgorgement need only be a

---

[2] The record suggests why petitioners never pursued such relief. Securities laws in Canada, petitioners' country of residence, barred them indefinitely from selling the shares redeemed from exercise of the options. The options were thus worth little or nothing to petitioners, especially in the short term. This is why Zacharias and his partners set up the illegal swap transaction. In addition, the effect of complying with U.S. law would likely have been substantial. Registration disclosures may have harmed Starnet's share price because its gambling enterprise was illegal in one of the company's principal places of business. A Canadian Mountie raid occurring shortly after petitioners' options transaction led to Starnet's share prices dropping sharply, never to recover.

[3] The dissent views our decision as holding that "we are jurisdictionally barred from considering petitioners' contentions, or at least some aspect of them." Dissent at 6. But neither in this court nor in the administrative proceedings did petitioners ever make the "contentions" the dissent ascribes to them. Petitioners' objection about the Commission's failure to restore them to their *status quo ante* position rested on their contention that they should have been permitted to retain the entire value of the *stock* they obtained during the illegal transaction. As stated in the text, petitioners did not mention or even hint at the dissent's contention

reasonable approximation of the profits causally connected to the violation. *First City*, 890 F.2d at 1231; *Bilzerian*, 29 F.3d at 697. Courts often "require the violator to return all profits made on the illegal trades." *First City*, 890 F.2d at 1231; *see also Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 171 (2d Cir. 1980). It was not the Commission's burden, *sua sponte*, to calculate the hypothetical value of the options and subtract the value from petitioners' profits. *See First City*, 890 F.2d at 1231. "Placing the burden on the petitioners of rebutting the SEC's showing of actual profits . . . may result, as it has in the insider trader context, in actual profits becoming the typical disgorgement measure." *Id.* at 1232. But the well-established principle is that the burden of uncertainty in calculating ill-gotten gains falls on the wrongdoers who create that

---

that the Commission should have deducted the value, if any, of their *options*.

Although Judge Williams quotes Carley mentioning his options, he does not include the sentences immediately following, where Carley argues that the Commission must "restore the valuable property rights in Starnet stock which Carley held at the time." Carley Opening Br. at 19; *see also* Zacharias Opening Br. at 39 ("Returning Mr. Zacharias to the *status quo ante* would require restoration of those shares [of Starnet] to him."). The common theme of petitioners' arguments is that they should not have to disgorge any money at all. To its credit, the dissent makes no such argument. The reason for the discrepancy is that petitioners' argument, unlike the dissent's, was not aimed at the Commission's calculation of ill-gotten profits. *Cf. Bilzerian*, 29 F.3d at 697 (resolving challenge to calculation of disgorgement amount). Their only argument was that in this particular case *any* disgorgement remedy would be punitive and therefore barred by the five-year statute of limitations. *See, e.g.*, Zacharias Opening Br. at 37-40.

uncertainty.  *Id.*; *Bilzerian*, 29 F.3d at 697; *see Johnson*, 87 F.3d at 488.

For the foregoing reasons, we grant the petition for review with respect to Zacharias and Carley's fraud and reporting violations, as well as the cease-and-desist orders based thereon, and remand for further proceedings.  We deny the petition for review with respect to the § 5 violations and associated penalties.

WILLIAMS, *Senior Circuit Judge*, dissenting in part: I respectfully dissent from Part IV.B of the court's opinion, which rejects Zacharias's and Carley's petition for review of the SEC's disgorgement order.

We have explained in the past that "disgorgement may not be used punitively" and that it applies only to "property causally related to the alleged wrongdoing." *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). As a result, "the SEC generally must distinguish between legally and illegally obtained profits." *Id*. See also *Johnson v. SEC*, 87 F.3d 484, 491 (D.C. Cir. 1996) (explaining that it is not a punishment "where the effect of the SEC's action is to restore the *status quo ante*, such as through a proceeding for... disgorgement of ill-gotten profits"). In *First City* we specified a sequence to be followed in such matters. We said that "the government's showing of appellants' actual *profits* on the tainted transactions at least presumptively satisfied" the government's burden to show that "its disgorgement figure reasonably approximates the amount of unjust enrichment." 890 F.2d at 1232 (emphasis added). At that point, "the burden of going forward shifted to [appellants, who] were then obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation." *Id*. Here (contrary to the panel's assertion, Maj. Op. at 21), the SEC did not attempt even a superficial showing of petitioners' profits; instead it pointed simply to their proceeds from the sales, after an arbitrary deduction of some costs but not others. The case should be remanded to the Commission to take the first step prescribed by *First City*.

Our cases make clear that proceeds alone cannot normally be regarded an approximation of profits. In *First City* appellants had violated § 13(d) of the Exchange Act by deliberately failing to disclose their accumulation of over five

percent of a company's stock within 10 days.  890 F.2d at 1217.  As a result of their trades they received proceeds of $134.1 million, "resulting in a $15.4 million profit." *Id.* at 1220.  The district court ordered disgorgement of a subset of this profit, $2.7 million, excluding increases in stock value occurring before appellants' duty to reveal their purchases arose.  The district court saw that subset as causally related to the violation, explaining that appellants' purchases thereafter were "at an artificially low price due to their failure to make the section 13(d) disclosure." *Id.* at 1221.  We approved that reasoning. *Id.* at 1230.

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994), is similar. Bilzerian had concealed his stock holdings and his financing capabilities in order "to create the impression that he was ready, willing and able to mount hostile takeovers." *Id.* at 692.  As a result, he was found to have violated § 10(b) and § 13(d) of the Exchange Act.  The district court found, and we affirmed, that Bilzerian's "misrepresentations *inflated* the price he received from the sale of the securities." *Id.* at 696. As a result, the court "ordered Bilzerian to disgorge the difference between the price he received for the sale of his shares—inflated artificially by his false filings with the SEC—and the price the shares would have brought were it not for his untimely and misleading filings." *Id.* at 697.  Though the defendant challenged the amount of disgorgement ordered by the district court, we affirmed because the "court was careful to order disgorgement of the *profits* caused by [defendant's] securities violations *only*." *Id*. (emphasis added)*.*  As had the court in *First City*, the district court had started by subtracting the defendant's purchase price of the stock from his final sale price (before making a further adjustment to avoid any disgorgement of legitimate appreciation). *Id.*

Thus, in both *Bilzerian* and *First City* we affirmed disgorgement orders only when they were limited to an approximation of the *profits* received by the defendants attributable to their unlawful conduct. Neither *First City* nor *Bilzerian* treats an initial calculation of mere proceeds as adequate to force the defendants to provide an alternative calculation of actual profits. Rather, in both cases the court first deducted the entire cost of acquiring the stock used to perpetuate the fraud from the wrongdoer's final proceeds, and then further reduced the disgorgement amount so that it reasonably approximated the profits actually caused by the fraud.

Here, in purporting to restore the status quo ante, and even though it claimed to be following the sequential process outlined in our cases, see *John A. Carley*, Opinion of the Commission and Order Imposing Remedial Sanctions 43-44, Admin. Proc. File No. 3-11626, Securities Act Release No. 8888, 92 SEC Docket 1693 (Jan. 31, 2008)("*SEC Opinion*"), the SEC took a far different approach. Rather than making any attempt to deduct the entire cost of the stock or in any way calculate how the § 5 violations affected petitioners' selling price, it focused only on their proceeds. When discussing petitioner Zacharias's disgorgement order, it stated, "Zacharias sold [stock] in violation of Section 5 of the Securities Act. Disgorgement prevents Zacharias from retaining the *proceeds* of these illegal sales and as such serves a remedial rather than a punitive purpose." See *SEC Opinion* 44 (emphasis added). Similarly, when discussing petitioner Carley's disgorgement order, the SEC stated, "The *amounts* Carley received through these sales are therefore ill-gotten gains that should be disgorged." *Id.* (emphasis added). The SEC made no finding, as we did in both *Bilzerian* and *First City*, that petitioners' conduct somehow influenced their stock's cost or selling price. Indeed, the only evidence in the record that speaks to the price of the stock indicates that it was

the general rise in the price of technology stocks, coupled with Starnet's drastic increase in net revenue, that led to its price explosion. See *John A. Carley*, Initial Decision 6, Initial Decision Release No. 292, Admin. Proc. File No. 3-11626 (July 18, 2005). Were the SEC's reasoning sound, the Commission in *First City* could have shifted the burden to appellants merely by noting the proceeds of $134 million.

In essence, the SEC's simulated computation of the status quo ante disregarded the property that petitioners supplied in return for the Starnet stock that was then sold in violation of § 5—the options that had been legally registered and issued to them pursuant to Starnet's Forms S-8. See *SEC Opinion* at 5. The Commission made no attempt to explain why it did not deduct the options' value. Consider an economically equivalent transaction: suppose that instead of being paid in part with options, petitioners' salaries had been equivalently higher and they had used the incremental cash income to purchase Starnet stock to funnel through the Peeper Entities to the public. In such a scenario, the SEC's failure to deduct the cost would have represented a naked violation of the principles of *First City* and *Bilzerian*.

To be sure, the fact that the cost of petitioners' stock took the form of options made it harder to compute a restoration of the status quo ante. Application of those cases' principle would require a calculation of the value of the options that petitioners could have legitimately and contemporaneously realized. The calculation might well have been difficult, and under our cases petitioners would have borne "the risk of uncertainty." *First City*, 890 F.2d at 1232. (I note, however, that in order to show the effect of the employee stock options on the company's net income, Starnet filed reports stating the fair value of the options calculated under methods approved by the Commission. See, e.g., Exhibit 442, Joint Appendix 1332.) While the majority suggests various factors that might

have justified the SEC in assigning the options a zero value, see Maj. Op. at 22 n.2, the SEC Opinion's pretend search for the status quo ante makes no mention of petitioners' costs and simply asserts that their proceeds resulted from their § 5 violation. We can affirm only on the basis of the Commission's reasoning, see, e.g., *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943), not on my colleagues' speculations, however intuitively plausible and perhaps, in the end, correct.

Though the Commission consistently referred to its disgorgement amount as an approximation of mere "proceeds," it evidently made a deduction for the exercise price of the options and brokers' fees, as the Commission only ordered disgorgement of the final amounts actually remitted to petitioners Carley and Zacharias in their brokerage accounts, which were net of these costs. If anything, this makes the Commission's position even more obscure. The fact that it deducted some costs for obtaining the stock provides no answer for why it failed to deduct others. If the majority is right, and the SEC can simply point to proceeds without any explanation as to why certain costs of obtaining such proceeds are irrelevant, then it can simply pull a profit estimate out of thin air (e.g., gross proceeds) and thereby switch the burden to the petitioners to refine that calculation. Our case law, however, clearly requires that the SEC, on its own, make a "reasonable approximation of profits," *First City*, 890 F.2d at 1231, and not an entirely arbitrary one.

The majority relieves the SEC of its burden to value the options on its own because "the burden of uncertainty in calculating ill-gotten gains falls on the wrongdoers who create that uncertainty." Maj. Op. at 23-24. But none of the cases cited by the majority supports the proposition that uncertainty shifts the initial burden. Instead, the cases merely justify imprecision in that attempt so long as the *attempt itself* was a reasonable one. See *First City*, 890 F.2d at 1232 (explaining

that "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty" *only after* the SEC's showing of a reasonable approximation of actual profits); *Bilzerian*, 29 F.3d at 697 (same).

I am somewhat puzzled by the panel's suggestion that we are jurisdictionally barred from considering petitioners' contentions, or at least some aspect of them. The court concedes petitioners properly raised, both before us and the SEC, the argument that the SEC's order failed to restore the status quo ante. See Maj. Op. at 21. As the Commission's "proceeds" analysis did not even allude to what petitioners' gave up in exchange for the proceeds, it plainly made no effort at all to approximate the status quo ante—at least no non-frivolous effort.

Even assuming arguendo that the SEC's superficial discussion was enough to meet its burden under *First City*, the panel's claim that petitioners did not adequately raise the issue of the consideration they provided turns on a quibble. Before the Commission they argued that the disgorgement should be zero, because they gave up their stock, which they asserted was "actually worth the amount for which it was sold" and whose value had been found by the administrative law judge to be based on Starnet's "dramatic business success." Brief in Support of Petition for Review of Respondent Christopher H. Zacharias at 18 (Oct. 17, 2005). As my analysis above indicates, I do not regard this analysis as complete, for it doesn't address the obstacles to petitioners' contemporaneously and lawfully realizing that value. But the Commission's *only* response was to say that the stock was sold *illegally*, so that (non sequitur of the day!) petitioners must forego all proceeds. The Commission offered no argument as to how compliance with the requirement of filing a registration statement would have reduced petitioners' proceeds; it stood simply on the raw fact of illegality. Before

us, though the majority claims otherwise, Maj. Op. at 22 n.3, petitioners' attack on the SEC's failure to restore the status quo ante has drawn our attention also to the value of the *options*, which were unequivocally theirs. "The options issued to Carley were valid and . . . Carley had a valuable property right in the options and then in the underlying stock subject to the options." Carley Opening Br. 19. And, as the argument suggests, the value of the stock was mathematically tied to the value of the options, the only difference being the contractually prescribed exercise price. Even if we regard as extreme petitioners' alternative calculation (showing no excess of illegitimate over legitimate proceeds), the SEC never attacked their calculation by pointing to obstacles to petitioners' lawful realization of identical proceeds. Thus, again assuming that the Commission met its initial *First City* burden, petitioners' claim was enough to switch the burden back to the SEC to show why its order properly accounted for *all* property legally owned prior to the scheme.

In discussing this same jurisdictional argument, the majority seems to suggest that the petitioners' attack on the SEC's order as failing to restore the *status quo ante* was somehow "not aimed at the Commission's calculation of ill-gotten profits." Maj. Op. at 23 n.3. But the majority correctly states that the very reason disgorgement is not a penalty is because "disgorgement restores the *status quo ante by depriving violators of ill-gotten profits*." Maj. Op. at 21 (emphases added). An attack on the SEC's order as one that failed to restore the *status quo ante*, which was indisputably advanced below, see *SEC Opinion* at 44 (responding to the argument that "disgorgement would not return Mr. Zacharias to the status quo ante" (internal quotations omitted)), is therefore *by definition* an attack on the SEC's calculation of ill-gotten profits. Petitioners' argument, both before the Commission and us, has been that the SEC's calculation of ill-gotten profits was flawed because petitioners would have

received the same profits even if they had acted lawfully. While it is true the petitioners argued they should not return any of their proceeds, that was because they claimed that the SEC's calculation was inappropriate, not because of any notion that disgorgement can never be properly applied in the context of a § 5 violation, as the majority seems to suggest. Thus, I fail to see anything meaningful in the distinction the majority claims exists between the arguments advanced by petitioners and the arguments discussed here, see Maj. Op. at 23 n.3, apart from the quibble over option value versus stock value.

I would remand to the SEC for it either to explain why the mere presence of options, as opposed to cash, justifies its dispensing with the process outlined in *First City* and *Bilzerian*, or to make an initial calculation of the value petitioners could have legitimately and contemporaneously realized from their options.